THE HONORABLE JOHN C. COUGHENOUR

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| Terrance Johnson, Brent Yahraus, and Jacy Purkiss, individually and as the representatives of a class of similarly situated persons, and on behalf of the Carpenters of Western Washington Individual Account Pension Plan and the Carpenters Retirement Plan of Western Washington, <br><br> Plaintiffs, <br><br> v. <br><br> Carpenters of Western Washington Board of Trustees, Callan LLC, Gerald Auvil, Noe Castillo, Ken Ervin, Jeff Foushee, Kurt Hildebrand, Steve Hoffmann, Martin Holberg, Dan Hutchins, Ryan Hyke, Andrew Ledbetter, Ron Montoya, Jim Osborne, Tim O'Neill, Doug Peterson, Rick Poitras, Danny Robins, Evelyn Shapiro, Bob Susee, Jeff Thorson, Doug Tweedy, and Wilf Wainhouse, <br><br> Defendants. | Case Number: 2:22-cv-01079-JCC <br><br><br><br> **FIRST AMENDED COMPLAINT – CLASS ACTION** |

**NATURE OF THE ACTION**

1.      Carpenters work a physically demanding job. It is important that they save enough money to retire before their bodies give out. Defendants in this case were responsible for investing the savings of over 15,000 carpenters. These carpenters counted on Defendants to make prudent investments that would allow them to retire when the time came. Instead,

FIRST AMENDED COMPLAINT –
CLASS ACTION (2:22-cv-01079-JCC) - 1

ENGSTROM LEE
1330 LAGOON AVE., 4TH FLOOR
MINNEAPOLIS, MN 55416
TEL: 612-699-4703

Defendants put a huge chunk of the carpenters' retirement savings into speculative investments that were inappropriate for these participants. As a result, the plans lost over $250 million. Now, these carpenters must work years longer before they can retire, and live more modest lifestyles once they belatedly retire.

2.     Plaintiffs Terrance Johnson, Brent Yahraus, and Jacy Purkiss ("Plaintiffs"), individually and as representatives of the class defined herein, and on behalf of the Carpenters Individual Account Pension Plan of Western Washington (the "DC Plan") and the Carpenters Retirement Plan of Western Washington (the "Pension Plan") (collectively, "the Plans"), bring this action under the Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. § 1001, *et seq.* ("ERISA"), against Defendants Carpenters of Western Washington Board of Trustees (the "Board") and Callan LLC, f/k/a Callan Associates, Inc. ("Callan") (collectively, "Defendants"). As described herein, Defendants have breached their fiduciary duties with respect to the Plans in violation of ERISA, to the detriment of the Plans and their participants and beneficiaries. Plaintiffs bring this action to remedy Defendants' unlawful conduct, prevent further mismanagement of the Plans, and obtain equitable relief as provided by ERISA.

## INTRODUCTION

3.     Plaintiffs are participants in two retirement plans: the DC Plan and Pension Plan. These are collectively bargained retirement plans that make up the entirety of retirement benefits for union carpenters in Washington, Idaho, Montana, and Wyoming. All union carpenters in these states are automatically enrolled in both Plans.

4.     The DC Plan is a defined contribution plan, "meaning that participants' retirement benefits are limited to the value of their own individual investment accounts, which is determined by the market performance of employee and employer contributions, less expenses." *Tibble v. Edison Int'l*, 575 U.S. 523, 525 (2015). As of the end of 2020, more than 20,000 current and former union carpenters had DC Plan accounts with balances; 6,800 of those carpenters are already retired or separated from service. The DC Plan held approximately $564

FIRST AMENDED COMPLAINT –
CLASS ACTION (2:22-cv-01079-JCC) – 2

**ENGSTROM LEE**
1330 LAGOON AVE., 4TH FLOOR
MINNEAPOLIS, MN 55416
TEL: 612-699-4703

million in assets as of the end of 2020.

5.     The Pension Plan is a cash balance defined benefit plan that provides periodic payments to retired participants and includes a variable feature not typically associated with pension plans. In other words, like the DC Plan, the Pension Plan's investment outcomes impact the amount of benefits participants receive. Over 21,000 union carpenters were enrolled in the Pension Plan as of the end of 2020, including 6,300 carpenters currently receiving benefits, 4,600 retired or separated carpenters entitled to future benefits, 1,700 beneficiaries of deceased participants, and 8,400 active participants.

6.     The Pension Plan was and still is underfunded, with its $1.6 billion in assets as of the end of 2020 sufficient to cover only 82% of future benefits, based on the actuarial assumption of a 7% overall rate of return.[1] A drop to below 80% funded would move the Pension Plan to "endangered" status, as defined by the Pension Protection Act of 2006. A change to endangered status generally results in a reduction in benefits for participants.

7.     In addition to providing retirement benefits that vary based on investment performance, the Plans shared another feature: participants had no control over their investments. Throughout the relevant period, the assets of both Plans were pooled together and managed as a single, one-size-fits-all investment strategy. Each participant earned the same investment return, which depended entirely on the performance of the investments chosen by the Board and Callan.

8.     When selecting funds for the Plans, Defendants were required to account for the Plans' unique characteristics. *See, e.g.*, *DiFelice v. U.S. Airways, Inc.*, 397 F. Supp. 2d 758, 772–73 (E.D. Va. 2005) (fiduciaries must consider the "facts and circumstances," including plan structure, cash flow needs and funding objectives, and participants' retirement timeframe and income needs) (quoting and citing 29 C.F.R. § 2550.404a-1(b)(2)). Defendants' investment approach therefore should have been informed by the nature of the Plans (in which Participants' benefits directly varied based on the investment performance of the Plans), the short timeframe

---

[1] At the end of 2015, the Pension Plan was in similar condition: $1.3 billion in assets and an 82% funded status.

FIRST AMENDED COMPLAINT –
CLASS ACTION (2:22-cv-01079-JCC) – 3

**ENGSTROM LEE**
1330 LAGOON AVE., 4TH FLOOR
MINNEAPOLIS, MN 55416
TEL: 612-699-4703

of the Plans' beneficiaries (with a large percentage of participants in or near retirement), and the Plans' funding status (wherein a drop of 3% or more of the Pension Plan's funded status would put the Pension Plan in "endangered" status, likely resulting in benefit cuts and/or higher member contributions). Highly speculative investments are rarely used in retirement plans, and in these circumstances, the Plans' structure and aims cautioned even more strongly against them.

9.      Nevertheless, Defendants threw caution to the wind. Contrary to the Plans' objectives, Defendants invested nearly a fifth of the Plans' assets in two volatility hedge funds: AllianzGI Structured Alpha 1000 Plus LLC ("1000 Plus") and AllianzGI Structured Alpha U.S. Equity 250 LLC ("Equity 250") (together, the "Funds" or "Structured Alpha Funds"). These funds are radically different than the funds typically found in retirement plans like the Plans, which invest in a diversified portfolio of stocks, bonds, or real estate. Rather, the Structured Alpha Funds seek to generate extremely high returns by repeatedly betting on the short-term direction of the stock market and level of market volatility, and employing significant leverage to boost both the number of bets and the consequences of those bets.

10.      The Structured Alpha Funds were wildly inappropriate in light of the Plans' investment timeframe, plan structure, and risk tolerance. As the Private Placement Memorandum ("PPM")[2] for each Structured Alpha Fund made clear, each fund was "speculative and entail[ed] substantial risks" given each fund's use of "leverage positions" and "short exposures" that would tend to "maximize the adverse impact to which the Fund's investment portfolio may be subject."[3] And because of those risks, each Fund's PPM stated that to invest in each Fund, "Subscribers must have the ability and willingness to accept . . . the risk

---

[2] "A private placement memorandum, also known as a PPM, is a document that contains relevant disclosures about purchasing shares of a company so that the investor can evaluate the risks of a particular investment decision." *Sadler v. Retail Props. of Am., Inc.*, No. 12 C 5882, 2014 WL 2598804, at *22 n.20 (N.D. Ill. June 10, 2014). "Reasonable diligence" in making an investment "does not consist of ignoring a private placement memorandum received prior to making an investment." *WA Sw. 2, LLC v. First Am. Title Ins. Co.*, 240 Cal. App. 4th 148, 157 (2015).

[3] AllianzGI Structured Alpha 1000 Plus LLC Private Placement Memorandum at 88, *Board of Trustees for the Carpenters of Western Washington v. AllianzGI*, Case No. 20-cv-9479, ECF No. 68-10 (hereinafter "1000 Plus PPM"); AllianzGI Structured Alpha U.S. Equity 250 LLC Private Placement Memorandum, at 78, *id.*, ECF No. 68-12 (hereinafter "Equity 250 PPM").

FIRST AMENDED COMPLAINT –
CLASS ACTION (2:22-cv-01079-JCC) – 4

**ENGSTROM LEE**
1330 LAGOON AVE., 4TH FLOOR
MINNEAPOLIS, MN 55416
TEL: 612-699-4703

of the potential **total loss of capital** resulting from an investment in the Fund."[4] These strategies are far outside the norm for retirement plan investment options.

11.    Despite the extreme riskiness of these funds, Defendants invested 17% of the Plans' assets in the Structured Alpha Funds as of the end of 2016. These investments were made by the Defendant Board at the recommendation of Defendant Callan, the Plans' investment consultant.

12.    The DC Plan was one of only two defined contribution plans in the country to invest in either of the Funds.[5] The Pension Plan was the only cash balance plan in the country to invest in either of these funds.

13.    The Funds were a poor choice for the Plans from the start, but additional red flags appeared after the Plans invested. Had Defendants appropriately monitored the Funds, they would have observed by 2018 and 2019 that, contrary to the Plans' objectives, the Funds' returns were highly correlated to the stock market during periods of negative returns, and that the Funds had substantial exposure to a stock market downturn.

14.    But Callan and the Board stood pat, either failing to notice these warning signs or simply ignoring them. When the next market downturn arrived in February and March 2020, the Funds predictably suffered disastrous losses. During this period, the 1000 Plus Fund lost 92% of its value and Equity 250 lost 54% of its value. There was no recovering from these losses: 1000 Plus was closed by the end of March, while the Plans liquidated their remaining assets in Equity 250 in early April. Participants in the Plans suffered more than $250 million in losses. The Board told participants these losses were "completely unacceptable,"[6] effectively admitting that the Board did *not* have the "ability and willingness" to accept "total loss of capital,"[7] despite its signed attestations to the contrary.

---

[4] 1000 Plus PPM at 107 (emphasis added); Equity 250 PPM at 95–96.
[5] The Arizona State Carpenters' Annuity Trust Fund invested $22.8 million of the Plan's $91 million in assets in the Equity 250 Fund.
[6] Carpenters Trusts of Western Washington, *AllianzGI Investment Losses Frequently Asked Questions*, at 3 (Feb. 15, 2021), available at https://www.ctww.org/html/ctww-allianz-faq-021521-nocrops.pdf (hereinafter "Allianz FAQ").
[7] 1000 Plus PPM at 107; Equity 250 PPM at 162–63.

FIRST AMENDED COMPLAINT –
CLASS ACTION (2:22-cv-01079-JCC) – 5

**ENGSTROM LEE**
1330 LAGOON AVE., 4TH FLOOR
MINNEAPOLIS, MN 55416
TEL: 612-699-4703

15. These losses have been devastating for the Plans and their participants. For example, Plaintiff Terry Johnson lost $20,000 from his DC Plan balance and $350 per year in Pension Plan benefits. These losses will take Johnson at least a year of full-time work to replace, even though he has wanted to retire.

16. The Funds' collapse had immediate consequences for participants in the Pension Plan. To avoid triggering "endangered" status by falling below the 80% funded threshold, in June 2020 the Board proposed increasing members' required contributions to the Pension Plan by a thousand dollars a year (without any increase in benefits), while declining to disclose that the real reason for the request was the Funds' losses.[8] Indeed, half of a $2 per hour raise due to participants in 2021 was instead reallocated to the Pension Plan to shore up its funded status. Defendants' fiduciary breaches have also made future contribution increases and benefit cuts more likely.

17. In November 2020, the Board (on behalf of the Plans) filed suit against the Funds' investment manager, Allianz Global Investors U.S. LLC ("Allianz") and other Allianz affiliates for violating ERISA,[9] one of at least 12 lawsuits brought against Allianz related to its management of the Structured Alpha Funds. Allianz settled the Board's suit in February 2022 as part of a global settlement.[10] The Plans received $110,390,267 net of attorneys' fees, representing less than 45% of the Plans' losses. Though this settlement is a good first step, it has not made Plaintiffs whole (nor even half) relative to what the Plans would have earned in prudent investments consistent with the asset allocation and risk levels in place before Defendants invested in the Structured Alpha Funds. Defendants have not taken responsibility for their role in the Plans' losses, nor have they contributed anything to the Plans or had any claims against them released.

---

[8] The Board misleadingly attributed the Pension Plan's funding status problem to pay cuts caused by the Covid-19 outbreak, declining to disclose anything about the collapse of the Funds.

[9] *Board of Trustees for the Carpenters of Western Washington v. AllianzGI*, No. 1:20-cv-09479, ECF No. 1 (S.D.N.Y. Nov. 12, 2020). The Board also brought claims for common law breach of fiduciary duty, negligence, and breach of contract.

[10] PENSIONS & INVESTMENTS, *Allianz Sets Aside $4.2 Billion for Structured Alpha Lawsuits, Probes* (Feb. 18, 2022), available at https://www.pionline.com/courts/allianz-sets-aside-42-billion-structured-alpha-lawsuits-probes.

FIRST AMENDED COMPLAINT –
CLASS ACTION (2:22-cv-01079-JCC) – 6

**ENGSTROM LEE**
1330 LAGOON AVE., 4TH FLOOR
MINNEAPOLIS, MN 55416
TEL: 612-699-4703

18.     These losses have had a long-term impact on participants' benefits. Even after accounting for settlement proceeds, Plaintiffs have still lost hundreds of dollars per year in pension benefits compared to what they would have received had Defendants not breached their fiduciary duties. The drop in Plaintiff Johnson's DC Plan account will still likely force him to delay his retirement by a year or more.

19.     In its role as the Plans' named fiduciary, the Board allocated more than $250 million of the Plans' assets to a speculative investment strategy that was inappropriate in light of participants' time horizon, risk tolerance, and financial objectives; failed to monitor that investment's compliance with the Plans' investment objectives; and stood mute until after that investment tore a hole in participants' retirement savings. The Board's actions and omissions constitute a breach of its fiduciary duties.

20.     In its role as the Plans' $360,000-per-year fiduciary investment consultant, Callan recommended a manifestly inappropriate investment, failed to adequately monitor that investment, and failed to recommend withdrawing from that investment despite a cavalcade of warning signs. Callan's actions and omissions constitute a breach of its fiduciary duties.

## JURISDICTION AND VENUE

21.     Plaintiffs bring this action pursuant to 29 U.S.C. § 1132(a)(2), which provides that participants in an employee retirement plan may pursue a civil action on behalf of the plan to remedy breaches of fiduciary duties and obtain monetary and appropriate equitable relief, as set forth in 29 U.S.C. § 1109(a).

22.     This case presents a federal question under ERISA, and therefore this Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1332(d) and 29 U.S.C. § 1132(e)(1).

23.     Venue is proper pursuant to 29 U.S.C. § 1132(e)(2) and 28 U.S.C. § 1391(b) because this is the district where the Plans are administered, where the breaches of fiduciary duties giving rise to this action occurred, and where certain Defendants may be found. In addition, Plaintiffs Yahraus and Purkiss reside in this District.

## PARTIES

FIRST AMENDED COMPLAINT –
CLASS ACTION (2:22-cv-01079-JCC) – 7

**ENGSTROM LEE**
1330 LAGOON AVE., 4TH FLOOR
MINNEAPOLIS, MN 55416
TEL: 612-699-4703

## I.   PLAINTIFFS

24.   Plaintiff Terrance Johnson resides in San Diego, California. Plaintiff Johnson was an active participant in both Plans through mid-2021, at which time he ceased performing union work in the Pacific Northwest. Plaintiff Johnson is a current participant in the Pension Plan and a former participant in the DC Plan, having withdrawn his assets in 2021. Plaintiff Johnson's DC Plan balance and Pension Plan benefit were both negatively affected by the fiduciary breaches described in this Complaint. When Johnson was working full-time, $200 was contributed to his DC Plan account each week. Net of the Allianz settlement payment, it will still take Plaintiff Johnson more than a year of full-time work to replace the money he lost as a result of Defendants' fiduciary breaches. Additionally, Plaintiff Johnson's monthly Pension Plan benefit is approximately $20 per month lower than it would have been absent Defendants' fiduciary breaches. Between the impact to Johnson's monthly benefits in the Pension Plan and the drop in value in his DC Plan account, Defendants' misconduct will likely force him to postpone his retirement date by a year or more.

25.   Plaintiff Brent Yahraus resides in Bonney Lake, Washington. Plaintiff Yahraus participated in the Plans throughout the proposed Class period and remains an active participant in both Plans. Plaintiff Yahraus's DC Plan balance and future benefit from the Pension Plan were both negatively affected by Defendants' fiduciary breaches, even net of the Allianz settlement payment. The value of Plaintiff Yahraus's accounts in the Plans would be greater today had Defendants not violated ERISA as described herein. Defendants' breaches will likely delay Plaintiff Yahraus's eventual retirement by at least a year.

26.   Plaintiff Jacy Purkiss resides in Lake Stevens, Washington. Plaintiff Purkiss participated in the Plans throughout the proposed Class period and remains an active participant in both plans. Plaintiff Purkiss's DC Plan balance and future benefit from the Pension Plan were both negatively affected by Defendants' fiduciary breaches, even net of the Allianz settlement payment. The value of Plaintiff Purkiss's accounts in the Plans would be greater today had Defendants not violated ERISA as described herein. Defendants' breaches will likely delay

FIRST AMENDED COMPLAINT –
CLASS ACTION (2:22-cv-01079-JCC) – 8

Plaintiff Purkiss's eventual retirement by at least a year.

**II.     The Plans and the Group Trust**

*The Carpenters Individual Account Pension Plan of Western Washington ("DC Plan")*

27.     The DC Plan is a multiemployer "employee pension benefit plan" within the meaning of 29 U.S.C. § 1002(2)(A) and a "defined contribution" or "individual account" plan within the meaning of 29 U.S.C. § 1002(34). As of the end of 2019, the DC Plan had nearly 20,000 participants, 474 contributing employers, and approximately $570 million in assets.

28.     As a defined contribution plan, the Plan provides retirement benefits to participants that are "limited to the value of their own individual investment accounts, which is determined by the market performance of employee and employer contributions, less expenses." *See Tibble*, 575 U.S. at 525.

29.     During the relevant period, the DC Plan was entirely trustee-directed, meaning that participants had no choice over how their retirement savings were invested.[11] Because Defendants adopted a "one-size-fits-all" investment strategy to which every participant was bound, Defendants' choices entirely determined participants' account balances and investment risk.

30.     Employing a one-size-fits-all investment structure is not an inherent fiduciary breach. However, the Board's decision to use this structure meant that Defendants had a duty to ensure that the investment mix they chose was appropriate for the Plan's entire range of participants, including the retirees and participants near retirement that held a significant portion of the DC Plan's assets.

*The Carpenters Retirement Plan of Western Washington ("Pension Plan")*

31.     The Pension Plan is a multiemployer "employee pension benefit plan" within the meaning of 29 U.S.C. § 1002(2)(A) and a "defined benefit plan" within the meaning of 29 U.S.C. § 1002(35). As of the end of 2019, the Pension Plan's composition mirrored that of the DC Plan, with more than 20,000 participants, more than 450 contributing employers, and

---

[11] 2020 DC Plan Form 5500 at page 39.

FIRST AMENDED COMPLAINT –
CLASS ACTION (2:22-cv-01079-JCC) – 9

approximately $1.7 billion in assets.

### *The Pension Plan's Benefits Formula*

32.    The Pension Plan is not like most pension plans. In most defined benefit plans, "retirees receive a fixed payment each month, and the payments do not fluctuate with the value of the plan or because of the plan fiduciaries' good or bad investment decisions." Thole v. U.S. Bank N.A, 140 S. Ct. 1615, 1618 (2020). As of January 1, 2017, the Pension Plan operated more like a defined contribution plan. Instead of a fixed monthly benefit, the amount of the monthly benefit paid to beneficiaries changes each year.[12]

33.    These variable monthly benefits are called "Sustainable Income Benefit" units.[13] The value of each Sustainable Income Benefit unit goes up or down each year depending on the Plan's investment performance, with a 4% return being break-even. A unit's increase in value is capped at 6% per year, which would require roughly a 10% investment return.

34.    For example, the Plans returned 4.20% in 2020 (net of settlement proceeds). Accordingly, the Sustainable Income Benefit unit value (and subsequently the monthly pension benefit for all work performed since 2017) increased by 0.20% on January 1, 2022. Had the Pension Plan not invested in the Structured Alpha Funds and instead invested in a prudent alternative, the Pension Plan would have returned over 10% in 2020 (as did most retirement plans) and the value of participants' Sustainable Income Benefit units (and the retirement benefit associated with them) would have increased by 6%. The difference between a Plan-wide gain of 10% and a gain of 4.20% is roughly $240 per year for participants like Plaintiff Terry Johnson, who are at or near retirement. The equivalent impact on younger participants like Plaintiff Jacy Purkiss is closer to $450 per year given the effect of compounding returns.

---

[12] This is known as a variable annuity pension formula and the Pension Plan is known as a "cash balance plan." *Carpenters Retirement Plan Document, Preamble* (amending and restating the Plan "to reflect amendments adopted at an October 4, 2016 meeting of the Board of Trustees implementing a new benefit accrual structure effective as of January 1, 2017") available at https://www.ctww.org/html/rtspd-carpenters-plan.html (last visited Aug. 1, 2022); *see generally Carpenters Retirement Plan Document, art. 6 (Retirement Income); id. § 6.1 (Normal Retirement Income)*, available at https://www.ctww.org/html/rtspd-article-6.html#a613c; 2020 Carpenters Retirement Plan of Western Washington Form 5500, at 40 (last visited Aug. 1, 2022).
[13] Benefits earned from 2017 onward were in the form of Sustainable Income Benefit units rather than fixed monthly distributions.

FIRST AMENDED COMPLAINT –
CLASS ACTION (2:22-cv-01079-JCC) – 10

**ENGSTROM LEE**
1330 LAGOON AVE., 4TH FLOOR
MINNEAPOLIS, MN 55416
TEL: 612-699-4703

35.     Participants' accrued Pension Plan benefits are adjusted on January 1 every year based on the investment returns from two years prior.[14] For example, the January 1, 2019 adjustment was based on 2017 investment returns, and the January 1, 2023 adjustment will be based on 2021 returns. Even in retirement, participants' Pension Plan benefits continue to vary annually according to the investment performance of the Plan.[15]

36.     As with the DC Plan, Pension Plan participants do not have any control over their investments or asset allocation. And because the Pension Plan is a cash balance plan, participants directly gain or lose pension benefits as a result of Defendants' investment selections. When Defendants' imprudent investment decisions hinder the Pension Plan's performance, this breach of fiduciary duty directly results in diminished pension benefits for participants.

*The Pension Plan's Funded Status*

37.     When the Plans first invested in the Structured Alpha Funds, the Pension Plan was already underfunded. At the end of 2015, the Pension Plan had $1.3 billion in assets, which was sufficient to cover only 82% of future benefits, assuming a 7% overall rate of return. By 2020, the Plan's assets grew to $1.6 billion, but the Plan's funded status stayed around 82%.

38.     A small drop in funding status would push the Pension Plan below 80%, moving it to "endangered" status, as defined by the Pension Protection Act of 2006. When a multiemployer plan's funding status drops to endangered, the plan must make changes that generally result in reduced benefits for participants. 26 U.S.C. § 432(b)(1)(A).[16]

---

[14] *See generally Carpenters Retirement Plan Document § 6.1 (Normal Retirement Income)* ("An Employee retiring on or after his [or her] Normal Retirement Date will be entitled to receive a monthly amount of Normal Retirement Income equal to the sum of his [or her] Past Service Benefit, his [or her] Future Service Benefit for Plan Years beginning before 2017, and his [or her] Sustainable Income Benefit for Plan Years beginning after 2016[.]"), available at https://www.ctww.org/html/rtspd-article-6.html#a613c (last visited Aug. 1, 2022); *id. § 6.1.3 (Sustainable Income Benefit)*, available at https://www.ctww.org/html/rtspd-article-6.html#a613c; *Carpenters Trust of Western WA – SIP Information* NORTHWEST CARPENTERS UNION (Oct. 12, 2016), https://youtu.be/2h6uZyirZXE.

[15] *Carpenters Retirement Plan Summary Plan Description: Sustainable Income Benefits*, available at https://www.ctww.org/html/rtspd-sustainable-benefit.html (last visited Aug. 1, 2022).

[16] The Pension Plan is not a single-employer defined benefit plan, where the employer is ultimately responsible for making up any funding shortfall. Rather, the Pension Plan is a multiemployer union plan, in which employers' liability is limited to their contractual obligations to cure underfunding subject to union-employer bargaining. As

FIRST AMENDED COMPLAINT –
CLASS ACTION (2:22-cv-01079-JCC) – 11

**ENGSTROM LEE**
1330 LAGOON AVE., 4TH FLOOR
MINNEAPOLIS, MN 55416
TEL: 612-699-4703

39.     The Pension Plan could still tolerate an ordinary level of risk. The Pension Plan's accounting method permitted it to space out recognition of gains and losses over a period of up to five years, to allow investments such as equities to recover from market fluctuations that temporarily depart from long-term average returns.[17]

40.     However, the Pension Plan could not countenance investments subject to total or near-total loss of the investment principal.[18] Such an event would push the Plan into endangered status and require reducing the benefits upon which participants rely. This was the impermissible risk posed by the Structured Alpha Funds.

### *Carpenters Trusts of Western Washington*

41.     At all relevant times, the assets of both Plans were held in a single overarching trust managed by the Board called the Group Investment Trust of the Carpenters Individual Account Pension Trust of Western Washington and Carpenters Retirement Trust of Western Washington (the "Group Trust"). The Group Trust commingles the Plans' assets, such that the DC Plan and Pension Plan experienced the same investment return based on the overall performance of the assets held in the Group Trust.[19]

42.     During the relevant period, the Group Trust maintained its principal place of business in Seattle, King County, Washington, and held between $1.8 billion and $2.8 billion in

---

a result, funding shortfalls generally result in a reduction in future benefits along with increased member and employer contributions (generally necessitating a reduction in wages or other benefits). Congressional Research Service, *Data on Multiemployer Defined Benefit (DB) Pension Plans* (2020), at 5–6, available at https://sgp.fas.org/crs/misc/R45187.pdf.

[17] Historically, this accounting method has allowed the Pension Plan to wait out market downturns. Stock market crashes (losses of 20% or more) happen roughly once every 5 years, and on average take 11 to 23 months to recover to previous levels, with the longest recovery period being 5 years. The Plan has generally had enough time to recover from even longer bouts of volatility, as Congress has historically reacted to widespread market downturns by allowing plans to realize these losses even more gradually. See 2016 Pension Plan Form 5500 at page 62 of 80 (discussing PPA legislation that permitted 2008 investment losses to be amortized over a 30-year period).

[18] Further, when total loss of capital within a certain segment of the portfolio is correlated with broad market decline, it is not reasonable to expect other parts of the portfolio to make up for total losses of this nature (as they have to recover from their own losses), and even then experience sufficient gains to provide the 7% overall rate of return that the Pension Plan's funding status assumes.

[19] The Group Trust also holds the assets of two other Taft-Hartley trust funds. Effective June 1, 2021, the DC Plan withdrew from the Group Investment Trust. 2020 DC Plan Form 5500 Filing at page 39 of 48. The Group Trust is in the process of being dissolved and assets of the remaining constituent plans will adopt new custodial arrangements. *Id.*

FIRST AMENDED COMPLAINT –
CLASS ACTION (2:22-cv-01079-JCC) – 12

**ENGSTROM LEE**
1330 LAGOON AVE., 4TH FLOOR
MINNEAPOLIS, MN 55416
TEL: 612-699-4703

assets.

## The Plans' Investment Mix and Risk Tolerance

43.     The Plans' risk tolerance was moderate to moderately conservative. Both before and after the Plans' investment in the extraordinarily risky Structured Alpha Funds, the Plans invested relatively conservatively. As the trustees stated in their 2020 annual report, the Plans' strategy was intended to be "moderately conservative when compared to other plans of its type."[20]

## The Plans' Investments Before Investing in the Structured Alpha Funds

44.     As of 2012, the Plans had approximately 45% of assets invested in bonds, 37% of assets in public equities, 9% in private equity, 7% in real estate, and 3% in hedge funds. This was a portfolio with a moderate risk tolerance, consistent with the 7% rate of return built into the actuarial assumptions for the Pension Plan.

45.     The addition of the Structured Alpha Funds created enormous new risk for the Plans. The Funds did not replace other highly risky investment options in the Pension Plan lineup. Rather, 1000 Plus replaced a significant portion of the Plans' bond portfolio in 2013. When investing more assets in 1000 Plus in 2016, Defendants appear to have further displaced the Plans' bond holdings.

46.     Defendants appear to have been ignorant of the additional risk they were taking on by adding the Funds. There was no change to the interest rate assumption for calculating Pension Plan benefits and no change to any Plan Document that Plaintiffs are aware of at this time. This reflects Defendants' mistaken belief that 1000 Plus was a relatively low-risk investment that would diversify against equity market risk (similar to the purpose served by fixed income investments) and act as a hedge against market declines. Given 1000 Plus's goal of 13% or greater gross returns—an extraordinarily high target—Defendants' apparent blindness to the Fund's risks could only have been the result of carelessness.

---

[20] Carpenters Trust of Western Washington, *Asset Allocation and Investment Manager Assignments* (4th Quarter 2020), available at https://www.carpentersbenefits.org/html/trust-summary.pdf.

FIRST AMENDED COMPLAINT –
CLASS ACTION (2:22-cv-01079-JCC) – 13

**ENGSTROM LEE**
1330 LAGOON AVE., 4TH FLOOR
MINNEAPOLIS, MN 55416
TEL: 612-699-4703

47.    The Plans invested in Equity 250 in 2016. This investment represented a similar upsurge in risk, as Equity 250's target was to out-earn a typical equity portfolio by 2.5% or more net of fees. During 2016, the Plans liquidated roughly $150 million of public equities and about $25 million in bonds in order to invest $176 million in Equity 250. Again, the Pension Plan made no change to its long-term return assumptions. This further demonstrates that Defendants (wrongly) viewed the Structured Alpha Funds as having comparable risks to the traditional investments previously held by the Plans.

### *The Plans' Investments After Removing the Structured Alpha Funds*

48.    After the Plans' investment in the Structured Alpha Funds lost nearly $250 million in 2020, Defendants invested the remaining assets from 1000 Plus (less than $10 million, down over 90% from year-end) and Equity 250 ($151 million, down 55% from year-end) in a Russell 1000 Index Fund, which tracks an index of large company U.S. stocks. This decision further demonstrates that Defendants desired a moderately conservative income and capital appreciation strategy for this portion of the Plan's portfolio—and failed to appreciate that the Structured Alpha Funds offered something very different.

## III.    DEFENDANTS

### *Board of Trustees*

49.    Defendant Carpenters of Western Washington Board of Trustees is based in Seattle, Washington. The Board is the "plan sponsor" within the meaning of 29 U.S.C. § 1002(16)(B) and is a "named fiduciary" pursuant to 29 U.S.C. § 1102(a) with respect to the Plans because it is identified in the Plan Documents as a fiduciary under ERISA.

50.    The Board is also a functional fiduciary because it has discretionary authority with respect to the Plans and the Plans' investments. The Board's fiduciary responsibilities include "full and exclusive power . . . to control and administer the Group Investment Trust" holding the assets of the DC Plan and the Pension Plan.[21] Furthermore, the Board is identified on the Subscription Agreements for both Funds as an "entity or person, that has, or has exercised any

---

[21] Trust Agreement for the Group Investment Trust of the DC Plan and Pension Plan, Sect. IV.1, *Town of Fairfield v. AllianzGI*, Case No. 1:20-cv-05817-KPF, ECF No. 60-33, at 60.

FIRST AMENDED COMPLAINT –
CLASS ACTION (2:22-cv-01079-JCC) – 14

**ENGSTROM LEE**
1330 LAGOON AVE., 4TH FLOOR
MINNEAPOLIS, MN 55416
TEL: 612-699-4703

discretionary authority, control, or responsibility with respect to the Plan's investment in the Fund, renders investment advice (within the meaning of Section 3(21)(A)(ii) of ERISA) with respect to such investment, or has authority to subscribe for or redeem Interests or negotiate the terms of this Subscription Agreement[.]"[22]

51.     According to the Plans' Form 5500s, the Board is also the Plan Administrator, controlling and managing the operation and administration of the Plans. Thus, the Board exercises discretionary authority or discretionary control with respect to management of the Plans as well as discretionary authority and responsibility with respect to the administration of the Plans, and is a functional fiduciary under 29 U.S.C. § 1002(21)(A).

### Board Members

52.     During the relevant period, the members of the Board of Trustees of the Carpenters of Western Washington included Gerald Auvil, Noe Castillo, Ken Ervin, Jeff Foushee, Kurt Hildebrand, Steve Hoffmann, Martin Holberg, Dan Hutchins, Ryan Hyke, Andrew Ledbetter, Ron Montoya, Jim Osborne, Tim O'Neill, Doug Peterson, Rick Poitras, Danny Robins, Evelyn Shapiro, Bob Susee, Jeff Thorson, Doug Tweedy, and Wilf Wainhouse. The members of the Board are employees of contributing employers and representatives of participating unions, and at all times were acting within the scope of their agency with the Board.

53.     As the individuals who make up the Board, the Board members had discretion over the investment of the Plans' assets and were responsible for investing in 1000 Plus and Equity 250 in 2014 and 2016, for monitoring those investments from 2014 through 2020, and for failing to remove them from the Plans. The Board members are therefore functional fiduciaries pursuant to 29 U.S.C. § 1002(21)(A).

54.     Half of the Board members were leaders within the Northwest Carpenters Union.

---

[22] Carpenters Trust of Western Washington Subscription Agreement for Allianz GI Structured Alpha 1000 Plus LLC, *Town of Fairfield v. AllianzGI*, Case No. 1:20-cv-05817-KPF, ECF No. 60-33 (hereinafter "1000 Plus Subscription Agreement"), at 37; Carpenters Trust of Western Washington Subscription Agreement for Allianz GI Structured Alpha U.S. Equity 250 LLC, *Fairfield v. AllianzGI*, ECF No. 60-33 (hereinafter "Equity 250 Subscription Agreement"), at 121.

FIRST AMENDED COMPLAINT –
CLASS ACTION (2:22-cv-01079-JCC) – 15

**ENGSTROM LEE**
1330 LAGOON AVE., 4TH FLOOR
MINNEAPOLIS, MN 55416
TEL: 612-699-4703

The other half of the Board members were appointed by employers that employ union members. The Board's members are not investment professionals, and generally lack sophistication related to complex investments and quantitative analysis. Upon information and belief, upon accepting Callan's recommendation to invest in the Structured Alpha Funds, the Board depended on Callan to regularly monitor the investments because the Board lacked the necessary sophistication to do so itself.

55.    On October 25, 2021, the Northwest Carpenters Union was placed in trusteeship of the national organization, the United Brotherhood of Carpenters and Joiners of America. This occurred a week after the resignation of Defendants Shapiro and Hutchins amidst an investigation into fraud, pension and welfare investment improprieties, and other areas of mismanagement.

56.    Defendant Ervin was also forced to resign due to his participation in a double-dipping overtime pay scheme.[23] In connection with proceedings that led to his resignation, Ervin "admitted that he did not understand the Allianz hedge funds investment at the time he voted to invest the members' pension funds in the Allianz hedge funds."[24]

### Callan LLC

57.    Defendant Callan is a registered investment adviser headquartered in San Francisco, California.[25] Callan has provided investment advisory services to the Plans since at least 2010, including advice concerning the selection, monitoring, and replacement of the Plans' investment options (subject to the ultimate discretion and approval of the Board). Among other services, Callan provided "quarterly reports and consulting meetings" at which it analyzed and made recommendations about the Plans' investments. *See* ECF No. 32-3 at 8 ("Agreement for Investment Consulting Services"). Thus, by the time Callan recommended the Structured Alpha Funds, it was providing customized advice to the Plans on a regular basis. Callan was removed

---

[23] Doug McCarron, General President of the United Brotherhood of Carpenters and Joiners of America, Notice of Trusteeship Hearing (Dec. 17, 2021), at 3, available at https://ubc1503.org/wp-content/uploads/12.17.2021-GP-Notice-of-Hearing.pdf.
[24] *Id.*
[25] On September 1, 2017, Callan Associates Inc. was converted to Callan LLC.

FIRST AMENDED COMPLAINT –
CLASS ACTION (2:22-cv-01079-JCC) – 16

**ENGSTROM LEE**
1330 LAGOON AVE., 4TH FLOOR
MINNEAPOLIS, MN 55416
TEL: 612-699-4703

as the Plans' investment consultant in 2021.

58. Callan's agreement with the Plans states, "Callan agrees that it is a fiduciary with respect to CTWW as that term is defined in § 3(21) of the Employee Retirement Income Security act of 1974, as amended. Except as otherwise provided by ERISA or applicable federal law, Callan will perform its duties under this Agreement consistent with the standard of care imposed on consultants providing like investment performance services under ERISA or applicable law."[26]

59. Callan tells its clients that it has "[d]ecades of hedge fund and multi-asset class research history and insights," that it will "make sure" its hedge fund recommendations "meet[] your specific needs," and that clients invested in hedge funds will receive "performance monitoring" and "ongoing education."[27] When Callan recommended the Structured Alpha Funds—which are classified as volatility hedge funds—Callan represented to the Board that Callan would provide these services on an ongoing basis. Callan's investment consultants are "required to carry out their duties solely in the best interests of our advisory clients and free from all compromising influences and loyalties."[28] A financial advisor with an obligation to avoid conflicts of interest and act in the interests of the client is considered to have a fiduciary relationship with its client under common law. *See Waddoups v. Nationwide Life Ins. Co.*, No. 33257-8-III, 192 Wash. App. 1078, at *24 (2016).

60. In addition to stating that Callan would perform research and monitoring for all investments, Callan's investment consulting agreement with the Plans specified a more intensive set of services that Callan agreed to perform related to "alternative investments" such as the Structured Alpha Funds.[29] Specifically, "Callan will provide full retainer consulting on the alternative investments in the Trusts including private equity, real estate, and absolute return

---

[26] Agreement for Investment Consulting Services, Callan Associates Inc. and Carpenters Trusts of Western Washington, ECF No. 32-3 at 5.

[27] Callan, *Alternatives Consulting*, available at https://www.callan.com/services/alternatives/ (last visited Aug. 1, 2022).

[28] Callan Form ADV Part 2A, at 6 (Mar. 22, 2022), available at https://files.adviserinfo.sec.gov/IAPD/Content/Common/crd_iapd_Brochure.aspx?BRCHR_VRSN_ID=760049.

[29] ECF No. 32-3 at 8.

FIRST AMENDED COMPLAINT –
CLASS ACTION (2:22-cv-01079-JCC) – 17

**ENGSTROM LEE**
1330 LAGOON AVE., 4TH FLOOR
MINNEAPOLIS, MN 55416
TEL: 612-699-4703

strategies, and opportunistic investments. Callan will work with the investment committee and staff to develop strategic plans for each asset class, conduct annual tactical reviews and recommend changes to investments, conduct full due diligence on all potential investment opportunities, and provide complete performance measurement and evaluation."[30]

61.    The Subscription Agreements for the Structured Alpha Funds also note that Callan gave the Plans fiduciary investment advice related to both Structured Alpha funds. The Subscription Agreement for each Fund lists Callan as an "entity or person, that has, or has exercised any discretionary authority, control, or responsibility with respect to the Plan's investment in the Fund, renders investment advice (within the meaning of Section 3(21)(A)(ii) of ERISA) with respect to such investment, or has authority to subscribe for or redeem Interests or negotiate the terms of this Subscription Agreement[.]"[31]

62.    The Board only became aware of the Structured Alpha Funds because Callan introduced the Board to the Funds, and the Plans would not have invested in the Structured Alpha Funds but for Callan's advice. *See* ECF No. 32 at 26. The Board generally lacked sophistication related to options, derivatives, the VIX, and equity market futures (all features of the Structured Alpha Funds—see *infra*) and depended on Callan both to assess the appropriateness of investing in a fund and then to monitor that fund. Callan's superior knowledge and assumption of the role of adviser is generally associated with a fiduciary relationship under common law. *Liebergesell v. Evans*, 93 Wash. 2d 881, 891 (1980).

63.    Both the Board as an entity and the management trustees individually have pled that "Callan was a fiduciary of the Plans." ECF No. 32 at 26; ECF No. 45 at 29. The management trustees further pled that "[i]n carrying out the responsibilities at issue in this action, the Trustee reasonably relied upon the advice given by Callan" and that "Callan had an ongoing duty to monitor." ECF No. 32 at 14, 23.

64.    Callan was significantly conflicted in proposing an investment in the Structured

---

[30] *Id.*

[31] 1000 Plus Subscription Agreement at 37; Equity 250 Subscription Agreement at 121.

FIRST AMENDED COMPLAINT –
CLASS ACTION (2:22-cv-01079-JCC) – 18

**ENGSTROM LEE**
1330 LAGOON AVE., 4TH FLOOR
MINNEAPOLIS, MN 55416
TEL: 612-699-4703

Alpha Funds. As of the time of the investment, Allianz and its affiliates Allianz Life Insurance Company and Pacific Investment Management Company were major customers of Callan's. This included hiring Callan to perform routine performance measurement and sending multiple employees to Callan's lavish educational events that can charge as much as $5,000 per person for a 2- to 3-day conference. Investment managers such as Allianz pay this compensation in part because they believe it will help them gain access to Callan's consultants, who act as gatekeepers for institutional investors such as retirement plans holding $4.4 trillion in assets.[32] By paying Callan for these services, Allianz got an opening to pitch products or investment strategies that Callan could subsequently recommend to its clients. Moreover, recommending complex investments such as the Funds helped Callan to justify its $360,000 annual consulting fee and retain its position, as the Board became dependent on Callan to monitor the Plans' complex portfolio.

65.     Callan is a fiduciary of the Plans under ERISA pursuant to 29 U.S.C. § 1002(21)(A) because Callan exercised discretionary authority or control respecting disposition of the Plans' assets and rendered investment advice for a fee or other compensation, direct or indirect, with respect to the Plans' assets.

66.     Each Defendant identified above as a fiduciary is also subject to co-fiduciary liability under 29 U.S.C. § 1105(a)(1)–(3) because it enabled other fiduciaries to commit breaches of fiduciary duties, failed to comply with 29 U.S.C. § 1104(a)(1) in the administration of its duties, and/or failed to remedy other fiduciaries' breaches of their duties, despite having knowledge of the breaches.

**FIDUCIARY RESPONSIBILITIES**

67.     ERISA imposes a strict fiduciary duty of prudence upon fiduciaries of retirement plans. 29 U.S.C. § 1104(a)(1) states, in relevant part:

> [A] fiduciary shall discharge his [or her] duties with respect to a plan solely in the interest of the participants and beneficiaries and—

---

[32] Callan Form ADV Part 2A (March 22, 2022), available at https://files.adviserinfo.sec.gov/IAPD/Content/Common/crd_iapd_Brochure.aspx?BRCHR_VRSN_ID=760049.

FIRST AMENDED COMPLAINT –
CLASS ACTION (2:22-cv-01079-JCC) – 19

**ENGSTROM LEE**
1330 LAGOON AVE., 4TH FLOOR
MINNEAPOLIS, MN 55416
TEL: 612-699-4703

(A) for the exclusive purpose of
(i) providing benefits to participants and their beneficiaries; and
(ii) defraying reasonable expenses of administering the plan;
(B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims . . . .

29 U.S.C. § 1104(a)(1). This is commonly referred to as the "duty of prudence."

68.     The duty of prudence is not a lay person standard, but instead "requires expertise in a variety of areas, such as investments." Dep't of Labor, Meeting Your Fiduciary Responsibilities (Sept. 2017), at 2, available at https://www.dol.gov/sites/default/files/ebsa/about-ebsa/our-activities/resource-center/publications/meeting-your-fiduciary-responsibilities.pdf.

69.     The duty of prudence applies to the initial selection of a plan's investment options, and also entails a "continuing duty to monitor [plan] investments and remove imprudent ones." Tibble, 575 U.S. at 530; Johnson v. Providence Health & Servs., No. C17-1779-JCC, 2018 WL 1427421, at *4 (W.D. Wash. Mar. 22, 2018). Fiduciaries may therefore be held liable for imprudent selection of investments or for failing to monitor a plan's investments to ensure that each remains prudent.

70.     When deciding whether to select, retain, or remove a plan investment option, fiduciaries must "employ[] appropriate methods to investigate the merits of the investment," Donovan v. Mazzola, 716 F.2d 1226, 1232 (9th Cir. 1983), including considering the "the risk of loss and the opportunity for gain . . . associated with the investment . . . compared to the opportunity for gain . . . associated with reasonably available alternatives with similar risks." 29 C.F.R. § 2550.404a-1(a)(2)(i). If an investment is imprudent, the fiduciary "must dispose of it within a reasonable time." Tibble, 575 U.S. at 530 (quoting BOGERT & BOGERT LAW OF TRUSTS AND TRUSTEES § 685, at 156–57 (3d ed. 2009)).

71.     Although a retirement plan sponsor and fiduciary committee (such as the Board) may seek input from an investment consultant (such as Callan) about a plan's investment options, this does not absolve the sponsor and committee of their fiduciary duties. See Baird v.

FIRST AMENDED COMPLAINT –
CLASS ACTION (2:22-cv-01079-JCC) – 20

**ENGSTROM LEE**
1330 LAGOON AVE., 4TH FLOOR
MINNEAPOLIS, MN 55416
TEL: 612-699-4703

BlackRock Inst'l Trust *Co.*, 403 F. Supp. 3d 765, 779 (N.D. Cal. 2019) ("[C]ourts are in broad accord that engaging consultants, even well-qualified and impartial ones, will not alone satisfy the duty of prudence.") (citation and quotation marks omitted). In such a case, the sponsor, committee, and consultant share these fiduciary duties under 29 U.S.C. § 1104(a) and the hiring fiduciary is obligated to monitor the consultant's performance. 29 C.F.R. § 2550.404c-1(d)(2)(iv); *Moitoso v. FMR LLC*, 451 F. Supp. 3d 189, 207 (D. Mass. 2020) (noting that "a plan sponsor can incur liability when it fails to carefully select or monitor the service provider, and that service provider then breaches a delegated duty").

72. When an investment consultant "provides advice about investments, a fiduciary duty is breached when the client is encouraged to purchase an investment with a level of risk that is not appropriate for the client, or is not properly informed of the speculative nature of an investment." *Sakai v. Merrill Lynch Life Ins. Co.*, No. C-06-2581 MMC, 2008 WL 4193058, at *3 (N.D. Cal. Sept. 10, 2008) (citing *Vucinich v. Paine, Webber, Jackson & Curtis, Inc.*, 803 F.2d 454, 460–61 (9th Cir. 1986)).

73. In assessing the prudence of an investment, the risk of an investment is not assessed in isolation, but within the context of the portfolio as a whole. *Sacerdote v. New York Univ.*, 9 F.4th 95, 109 (2d Cir. 2021). Determining whether a high-risk investment is prudent depends upon factors such as the investment's role within the portfolio, the aims and objectives of the plan including its overall risk tolerance, the anticipated cash flow requirements of the plan, and the projected return of the portfolio relative to the funding objectives of the plan. *See Cal. Ironworkers Field Pension Trust v. Loomis Sayles & Co.*, 259 F.3d 1036, 1043–44 (9th Cir. 2001) (citing 29 C.F.R. § 2550.404a-1(b)(2)).

74. The Department of Labor has insisted since the inception of ERISA that "the risk level of an investment does not alone make the investment *per se* prudent or *per se* imprudent." *Tatum v. RJR Pension Inv. Comm.*, 761 F.3d 346, 366–67 (4th Cir. 2014) (quoting Dep't of Labor, *Investment of Plan Assets under the "Prudence" Rule*, 44 Fed. Reg. 37,221, 37,225 (June 26, 1979)). Instead, the determination of whether a fiduciary has breached the duty of

FIRST AMENDED COMPLAINT –
CLASS ACTION (2:22-cv-01079-JCC) – 21

**ENGSTROM LEE**
1330 LAGOON AVE., 4TH FLOOR
MINNEAPOLIS, MN 55416
TEL: 612-699-4703

prudence by investing in an excessively risky investment will turn upon "the surrounding facts and circumstances" including the "character and aim of the particular plan and decision at issue." *Id.*; *see, e.g.*, *Cal. Ironworkers*, 259 F.3d at 1044 (affirming district court decision that duty of prudence was breached by investing in particular security in light of plan's conservative investment objectives and the riskiness of the investment).

## STRUCTURED ALPHA FUNDS – FACTUAL BACKGROUND

75.    The Plans invested in two of Allianz's Structured Alpha funds: 1000 Plus and Equity 250. The investment strategy of these funds radically departed from the strategy of funds typically held in retirement plans similar to the Plans.

76.    In a typical retirement plan investment fund, the fund holds various securities—usually stocks or bonds. The fund's strategy is to select and hold securities that will appreciate in value, thereby increasing the value of the fund.

77.    The Structured Alpha Funds employed an entirely different strategy founded on derivatives and leverage. To appreciate the extraordinary riskiness of the Funds' strategy, a summary of the strategy's components is helpful.

### Alpha and Beta

78.    Both Funds had two components: "alpha" and "beta." In the beta component, all of the fund's assets were invested in a benchmark index, much like a traditional index fund. For Equity 250, the benchmark was the S&P 500. For 1000 Plus, the benchmark was a treasury bill index (BofA ML 3-Month Treasury Bill Index). The beta component is unremarkable: index funds tracking these indices are available for fees 100 to 300 times lower than what Allianz charged for the Funds.

79.    The Funds' "alpha" component represents the radical departure from retirement investing norms. The strategy of the "alpha" component was to use the underlying investment in the beta component as collateral in order to execute a derivatives-trading strategy. This financial engineering was meant to generate huge returns above the Funds' underlying benchmark. 1000 Plus's objective was to generate a gross annual return of 1,300 basis points

FIRST AMENDED COMPLAINT –
CLASS ACTION (2:22-cv-01079-JCC) – 22

(or 13%) over its benchmark index. Equity 250's objective was to generate a gross annual return of 375 basis points (or 3.75%) over its benchmark index.[33]

80. The Funds relied on three tools to pursue these outsize returns: futures, options, and leverage.[34]

**Futures**

81. A futures contract is an agreement to buy or sell a particular asset or security at a predetermined price on a specific future date. The underlying asset to a futures contract can be a single stock or bond, or the contract can be tied to the price of an index, such as the S&P 500.

82. Futures possess two key features. First, they are mandatory, meaning that neither party can decline to exercise the contract. Second, the transaction occurs on a certain date, which can be anywhere from a week to several years in the future.

83. The Structured Alpha Funds invested in two types of futures contracts. First, equity index futures: bets on the future price of a securities index, such as the S&P 500. Second, volatility index futures: bets on the future amount of volatility in a stock index.[35] Allianz supercharged these futures' potential for gains or losses by applying two additional tools: options and leverage.

**Options**

84. Options come in many varieties: calls and puts, bought and written, covered and naked, levered and unlevered. The Structured Alpha Funds bought and sold options of nearly every variety.

*How Options Work*

---

[33] This translates to 1000 and 250 basis points of additional returns *after* fees by the 1000 Plus and Equity 250 Funds, respectively, which is the basis for each fund's name.

[34] Futures and options are derivatives. Derivatives are defined as "financial instruments that derive their value (hence the name) from an underlying security or index." *Magma Power Co. v. Dow Chem. Co.*, 136 F.3d 316, 321 (2d Cir. 1998). A derivative can be related to a specific asset (like an individual stock) or an otherwise un-investable index, rate, or financial event, (such as the value of the S&P 500 or the level of stock market volatility). Two key features distinguish derivatives from a traditional security like a stock or bond. First, a derivative is synthetic: its value is inherently tied to the value of some other asset. Second, because derivatives are contractual, there are at least two parties to a derivative.

[35] 1000 Plus PPM at 86–87; Equity 250 PPM at 76–77.

FIRST AMENDED COMPLAINT –
CLASS ACTION (2:22-cv-01079-JCC) – 23

**ENGSTROM LEE**
1330 LAGOON AVE., 4TH FLOOR
MINNEAPOLIS, MN 55416
TEL: 612-699-4703

85.    Options share some features with futures. Like a futures contract, an option contract provides the right to either buy or sell a security at a contractually determined price in the future. However, options differ from futures in three key respects. First, an option holder is not required to exercise its option; the holder may let the option expire unused.[36] Second, the exercise date is flexible, meaning the option holder can exercise its option at any time before the expiration date. Third, options provide the opportunity to bet on a security's future price without having to buy that security.

86.    There are two types of options: calls and puts. A call option "gives the option holder the right to buy shares of an underlying security at a particular price." SEC. & FED. CORP. LAW § 10.11 at 10.73 (1997). Thus, the value of a call option increases in value as the value of the underlying security increases. *Id.* A put option is "the right to sell a security at a specified price; thus, the value of a put option increases as the price of the underlying security falls." *Magma Power*, 136 F.3d at 321. Because there are two parties to every option contract, each put or call has both a buyer and a seller (or writer).

*Buying an Option*

87.    As an example of buying a call, IBM stock closed at $135 per share on January 6, 2022. An investor believes the price of IBM stock will go up, but the investor has limited capital. Rather than buying IBM stock at $135 per share, the investor instead buys an IBM *call*. This call gives the investor the option to buy IBM stock at the strike price (in this example, $140 per share) any time for the next 22 days (until January 28, the exercise date in this example), regardless of the market price of IBM stock during that period. On January 6, this call cost $2.30 per share.[37]

88.    Suppose the investor wished to cash out if IBM stock reached $145 per share. If IBM stock hit that price, the investor would exercise its option and buy IBM stock for $140 per

---

[36] However, an option *writer* (i.e. seller) must honor the agreement if the holder decides to exercise the contract.

[37] Options generally trade in blocks of 100 shares. This call would therefore typically cost $230 and allow the holder to buy 100 shares of IBM stock at $140 per share.

FIRST AMENDED COMPLAINT –
CLASS ACTION (2:22-cv-01079-JCC) – 24

**ENGSTROM LEE**
1330 LAGOON AVE., 4TH FLOOR
MINNEAPOLIS, MN 55416
TEL: 612-699-4703

share. The investor would then sell the just-purchased IBM stock for $145 per share. This would leave the investor with a profit of $5 per share, or more accurately, $2.70 per share after deducting the $2.30 per share cost of the call option.

89. The locked-in share price during the pendency of the option (i.e., $140 per share) is known as the option's **strike price**. The deadline for exercising the option (i.e., January 28) is the **expiration date**. So long as IBM trades below $140 per share, the option has no intrinsic value; one would never want to buy IBM stock for $140 per share when it is currently trading for $135 per share. When the current market price has not yet reached an option's strike price, the option is **out of the money**. When the current market price is beyond an option's strike price (i.e., for the above IBM call, IBM stock is trading above $140 per share), the option is **in the money**.

90. By purchasing an IBM call instead of an IBM share, the investor gains exposure to potential IBM stock gains at the cost of $2.30 per share rather than $135 per share. This is the fundamental value of options: permitting investors to make bets on the future direction of securities without paying all the money necessary to actually own those securities. If the investor had simply bought IBM shares rather than call options, the investor would have registered a 7% gain: the increase from $135 to $145 per share. A $1,000 investment in IBM would now be worth $1,070. By contrast, the investor's purchase of call options yielded a 112% gain: the difference between the $2.30 price per call and the $5 profit per share. A $1,000 investment in IBM call options would now be worth $2,173. By turning a 7% change in the stock price into a 112% gain on the original investment, buying an option magnified the investment impact to 16 times that of the underlying security. As the CFA Institute explains, "this kind of price volatility with options is the rule rather than the exception and entails substantially more volatility than do positions in the underlying asset."[38]

91. However, the downside risk of investing in call options is also radically different.

[38] Roger Clarke, Harindra de Silva & Steven Thorley, *Fundamentals of Futures and Options*, Research Foundation of CFA Institute (2013), at 51.

FIRST AMENDED COMPLAINT –
CLASS ACTION (2:22-cv-01079-JCC) – 25

**ENGSTROM LEE**
1330 LAGOON AVE., 4TH FLOOR
MINNEAPOLIS, MN 55416
TEL: 612-699-4703

Suppose that between January 6 and January 28, IBM stock stayed around $135 per share (which is in fact what happened). The investor who purchased actual IBM shares would have broken even, still holding $1,000 worth of stock. The option buyer would fare much worse. The option buyer would be left with nothing because the option was always out of the money. That investor's $1,000 has turned to zero.

*Writing an Option*

92.     **Writing** options creates even bigger risks. By writing the $140 call option discussed above, the call writer immediately receives income of $2.30 per share (or $230 for a call permitting the purchase of 100 shares of IBM). If IBM never reaches the strike price ($140 per share) by the expiration date, the call writer owes nothing. If IBM reaches $142.30 per share and the holder exercises the option, the call writer now has obligations. The call writer must buy IBM stock for $142.30 per share and sell it to the option holder for $140 per share. The call writer faces a loss of $2.30 per share, wiping out the $230 in income originally received and causing the call writer to break even.

93.     Things can get much worse for the call writer. Imagine that IBM stock jumps to $200 per share before the expiration date and the holder exercises the option. The option writer must spend $20,000 to buy 100 shares of IBM stock and then sell that stock to the option holder for $14,000. In this scenario, the call writer suffers a $5,770 loss: 26 times greater than the $230 in income received initially.

94.     In this way, writing options has limited upside and enormous potential downside. The call writer's upside is limited to the premiums collected when it first sells the option, while losses could be many times greater than the amount of that premium.

95.     This severe downside risk can be negated if the option writer owns the underlying stock. Suppose that simultaneous with writing the call, the call writer purchased 100 shares of IBM stock at the then-current market price of $135 per share. This time, when the option is exercised at $200 per share, the call writer simply sells its pre-purchased IBM stock to the call holder. While the call writer misses out on the $65 per share price increase, the call writer

FIRST AMENDED COMPLAINT –
CLASS ACTION (2:22-cv-01079-JCC) – 26

**ENGSTROM LEE**
1330 LAGOON AVE., 4TH FLOOR
MINNEAPOLIS, MN 55416
TEL: 612-699-4703

experiences no losses. (In fact, the call writer pockets $7.30 per share: the amount they were paid to write the option, plus the difference between the $135 purchase price and the $140 price at which they must sell the stock.) When used in this fashion, option writing is a defensive strategy that is not any riskier than simply owning the underlying stock. Writing a call option when you already own the underlying stock is known as a **covered call**. Writing a call option without owning the underlying security is an uncovered call, often referred to as a **naked call**.

*The Funds' Option Writing*

96.     The Funds sought to generate nearly all of their returns by writing options. The Funds barely hedged the options they wrote. As a consequence, the Funds were extremely risky investments.

97.     The Funds employed one risk mitigation method: hedging.[39] However, the Funds implemented this strategy haphazardly. After writing a risky option, the Funds would generally *buy* the same option at a different strike price—this practice is commonly referred to as hedging. Using the current example, an investor could write a $140 IBM call option for $2.30 per share and then *buy* a $170 IBM call option for $0.40 per share. If IBM stock went to $200 per share, the $5,770 loss from call-writing would be offset by a $2,960 gain from call-buying. However, buying a call with a strike price that far from the strike price of the call you sold remains dangerous, as this $2,810 net loss is still 15 times greater than the $190 in income ($230 minus the cost of the call option) generated by the call-writing.[40]

98.     As in the above example, the Funds left themselves vulnerable by buying options that were severely out of the money (i.e., with strike prices far apart from the strike prices of the options it wrote). So the Funds' risks were hardly mitigated at all.

**Leverage**

99.     On top of all this, the Funds piled leverage. In the context of investment funds, leverage is the use of "financial instruments and/or borrowed money to increase the fund's

---

[39] 1000 Plus PPM at 112; Equity 250 PPM at 100.
[40] By contrast, buying a call closer to the $140 strike price, such as for $150, would be a more effective hedge.

FIRST AMENDED COMPLAINT –
CLASS ACTION (2:22-cv-01079-JCC) – 27

**ENGSTROM LEE**
1330 LAGOON AVE., 4TH FLOOR
MINNEAPOLIS, MN 55416
TEL: 612-699-4703

market exposure beyond its net asset value."[41] Essentially, the Funds used leverage to amplify the consequences of their bets.

100. It is rare for a fund in a retirement plan portfolio to use leverage. In typical retirement plan funds, the risk associated with each security is limited to the amount of money the fund invests in that security. For example, investing in a biotech start-up may be risky, but if a fund invests only 1% of its assets in the biotech company, the fund can lose at most 1% of its value.

101. Consequences are more severe in a leveraged fund. There, negative returns from an investment representing only 1% of the fund's assets could generate a loss of 5, 15, 30, if not 50 percent of the fund's value, depending on the extent of the leverage. As the Structured Alpha Funds' PPM disclosed, "Leverage magnifies both the favorable and unfavorable effects of price movements in the investments made by the Funds, which may subject the Fund and the Members to a substantial risk of loss."[42]

102. The Funds used two types of leverage: minimally collateralized futures and the implicit leverage associated with writing uncovered options.[43]

103. First, minimally collateralized futures. The low level of collateral required to purchase a futures contract is a source of leverage. It works like this. The buyer of a futures contract is obligated to pay two amounts at two different times. First, upon purchase of the futures contract, the buyer must pay a small premium—the cost of the futures contract. Second, on the agreed-upon later date, the buyer must pay the full strike price of the security. However, along with the up-front premium, the buyer of a futures contract must post some amount of collateral toward the eventual purchase of the actual security. But this collateral requirement (which is set by the seller) is usually no more than 2%-10% of the security's strike price.[44] Thus, an investor buying futures contracts can bet on 10-50 times more securities than if she

[41] The Board of the International Organization of Securities Commissions, *Recommendations for a Framework Assessing Leverage in Investment Funds* (Dec. 2019), at 4, available at https://www.iosco.org/library/pubdocs/pdf/IOSCOPD645.pdf.
[42] 1000 Plus PPM at 106; Equity 250 PPM at 95.
[43] 1000 Plus PPM at 88; Equity 250 PPM at 77–78.
[44] *Fundamentals of Futures and Options* at 9.

FIRST AMENDED COMPLAINT –
CLASS ACTION (2:22-cv-01079-JCC) – 28

**ENGSTROM LEE**
1330 LAGOON AVE., 4TH FLOOR
MINNEAPOLIS, MN 55416
TEL: 612-699-4703

were simply buying the underlying security. This is a significant form of leverage.

104.    However, this leverage can expose investors to tremendous losses. For example, take an S&P 500 futures contract valued at $66,533 with a collateral/margin requirement of only $5,625 (around 8% of the contract's actual cost).[45] Suppose an investor buys this futures contract but deposits only the minimum amount of collateral: $5,625. In this scenario, if the S&P 500 goes up 0.45%, the investor receives a gain of 5.33%, amounting to $3,456. The investor's futures bet is levered at about 11.8 to 1. On the flip side, if the market drops 20%, the investor does not lose 20%; the investor loses $13,306 (20% of the full contract value), which represents 236% of the amount invested. Thus futures "can be used in a highly leveraged way . . . depending on how much the investor commits to the initial margin account."[46] The Funds used futures in this fashion. As the Funds' PPM explained, "the Fund . . . will obtain operational leverage . . . through the use of certain derivative instruments and . . . due to the low margin deposits required in futures and options trading . . . ."[47]

105.    Second, the Funds created leverage through writing options that were generally unhedged or partially unhedged. The significant leverage associated with writing such options is described *supra* ¶¶ 84–95.

106.    Taken together, the Funds' option-writing and purchase of lightly collateralized futures contracts created immense leverage, and with it the potential to produce losses many times greater than the price changes experienced by the underlying securities or indices that these investments were tied to.

### Volatility Index Futures (the "VIX")

107.    The Funds' reckless use of options is best encapsulated by the Funds' use of volatility index futures.[48] Volatility index futures (popularly known as the VIX) are an invented

---

[45] *Id.* at 11.
[46] *Id.* at 11–12.
[47] 1000 Plus PPM at 106; Equity 250 PPM at 95.
[48] 1000 Plus PPM at 86–87 ("The Fund's Futures Component consists of a futures trading program . . . to achieve exposure to the VIX.").

FIRST AMENDED COMPLAINT –
CLASS ACTION (2:22-cv-01079-JCC) – 29

ENGSTROM LEE
1330 LAGOON AVE., 4TH FLOOR
MINNEAPOLIS, MN 55416
TEL: 612-699-4703

security whose value is tied to the level of stock market volatility.[49] If the expected volatility of the S&P 500 increases, so does the value of the VIX.

108. The VIX has a negative correlation with the stock market: increasing volatility generally means a falling market. The VIX also experiences much greater changes in value than the stock market itself.[50] So not only does the VIX tend to move in the opposite direction of the market, but its movements are also several times larger than those of the market. Thus, investors can theoretically hedge their stock market risk with a smaller exposure to the VIX.

109. This explains why there is a large demand for VIX futures and options as a defensive investment. But every future and option contract requires two parties: a buyer and a seller. That is where the Funds stepped in. The Funds generated income by writing VIX futures and options, i.e., *selling* investors insurance against market volatility. When the market is calm, this is a good gambit: the Funds collect premiums, the market stays steady, and the options expire harmlessly. However, writing these options made the Funds hugely vulnerable to a volatile market.

110. The Funds' VIX option writing involved enormous implicit leverage. The VIX can more than triple in a period of less than a week, as occurred in 2010 (and many other occasions). And as discussed above, options writing often creates a leverage effect of 10 to 25 times the amount invested (and more if the options are out of the money). As a consequence, a quick tripling of the VIX could produce losses that are **30 to 75 times greater** than the income received from writing that same option.

111. A calm market can quickly turn volatile, with ruinous consequences for the option writer. On January 13, 2022, the VIX closed at 20.31. The closing price on a VIX call expiring

[49] In 1993, the Chicago Board Options Exchange created the CBOE Volatility Index, ticker symbol VIX, that uses the expected prices of S&P 500 options over the next 30 days to measure the market's expectations for market volatility over the next month. *See* Cboe Volatility Index (VIX), Investopedia, available at https://www.investopedia.com/terms/v/vix.asp (last visited Aug. 1, 2022).

[50] Since World War II, there have been 14 bear markets, meaning a decline in the S&P 500 of 20% or more, and only three of these involved a decline of 40% or more. VIX spikes are more severe and occur more often. As of April 12, 2022, the VIX has had a one-day spike of 40% or more on *twenty-one* different occasions since 1990. Chicago Board of Options Exchange, *Historical Data for Cboe VIX Index*, available at https://www.cboe.com/tradable_products/vix/vix_historical_data/ (last visited Aug. 1, 2022).

**ENGSTROM LEE**
1330 LAGOON AVE., 4TH FLOOR
MINNEAPOLIS, MN 55416
TEL: 612-699-4703

in 15 days with a strike price of 26 was $0.90. If the VIX were to triple in the next 15 days to 61 (a level that was reached 25 times in 2008, for example), the party writing the VIX call would lose $35 per share, a loss that is 39 times greater than the income received for writing the call.

112.    Take 1000 Plus, for example. 1000 Plus attempts to generate minimum monthly income of roughly 1.1% (to produce the 10% net-of-fee return promised by the fund's name). If 1000 Plus sought to generate that return by writing VIX calls similar to those described above, a tripling of the VIX could cause 1000 Plus to lose 43% of its value in two weeks.

113.    The frequency of spikes in the VIX was a well-known fact among investment professionals when Defendants invested in the Funds in 2014 and 2016. For example, in April 2010, the VIX tripled from 15 to over 45 over the course of a month. Between August 17–24 of 2015, the VIX level rose from 13 to 40, more than tripling. In 2008, the VIX level rose from around 20 at the beginning of September to over 80 by the end of October. Given the magnitude of such risks, it is easy to understand why Allianz warned that the Funds were only appropriate for investors who could sustain a total loss of their investment.

114.    Similar to the Funds' equity index positions, the Funds attempted to hedge their exposure to VIX options, but did so haphazardly. In some cases, the Funds' hedges were so far out of the money that the Funds would have suffered massive losses before the hedges became relevant. In other cases, the Funds only hedged against volatility spikes *by proxy*. Rather than hedging their VIX options with other VIX options, the Funds assumed that a spike in volatility would necessarily be accompanied by a market collapse. Acting on this erroneous assumption, the Funds attempted to hedge their VIX exposure with equity index options. This ignored the possibility of bi-directional volatility spikes, i.e., market tumult associated with an event that generated both good and bad news on different days. This of course occurs regularly during periods of uncertainty, and is precisely what happened in March 2020.

**Volatility Hedge Funds**

115.    The Funds' investment strategy was not novel. By 2018, between 50–100 hedge funds were generating most of their returns by investing in volatility-linked securities, much

FIRST AMENDED COMPLAINT –
CLASS ACTION (2:22-cv-01079-JCC) – 31

**ENGSTROM LEE**
1330 LAGOON AVE., 4TH FLOOR
MINNEAPOLIS, MN 55416
TEL: 612-699-4703

like the Funds did. Hedge Fund Research, Inc. ("HFR") (a leading provider of hedge fund data and analysis) placed the Funds in this group, defining them as "volatility hedge funds."[51] Cboe (the creator of the VIX) went even further, dividing volatility hedge funds into four categories depending on the nature of the fund's volatility strategy.[52] Cboe classified the Structured Alpha Funds as "Relative Value" funds because the Funds were permitted to make volatility bets in both directions and of varying durations.

116.   Volatility hedge funds are not *per se* imprudent. Because they heavily use implied leverage, these funds present a risk of total loss of investment. However, this may be an acceptable risk to certain investors. In particular, investors who have an extremely long investment horizon, who can afford to lose the entirety of their investment, and who are large enough to meet the investment minimum without committing more than 1–2% of their total assets to the volatility hedge fund. For example, depending upon their objectives, volatility hedge funds could be appropriate for private college endowments, large and fully-funded defined benefit plans, sovereign wealth funds, or ultra-high net worth individuals.

### Monitoring Volatility Hedge Funds

117.   Fiduciaries have a duty to monitor all investment options in a portfolio. Including a hedge fund among a retirement plan's investment options necessitates more complex and intensive forms of monitoring than for typical equity and bond investments. This is true for a variety of reasons.

118.   First, unlike the vast majority of investment options found in retirement plans, hedge funds are only lightly regulated.[53] Therefore, hedge fund investors have fewer guardrails they can rely upon to keep the managers' conduct in check.

119.   Second, hedge funds' investment strategy is unconstrained and frequently

[51] Hedge Fund Research, *HFR Hedge Fund Strategy Classification System*, available at https://www.hfr.com/hfr-hedge-fund-strategy-classification-system (last visited Aug. 1, 2022).
[52] Cboe, *Cboe Eurekahedge Volatility Indices*, available at https://www.cboe.com/us/indices/benchmark_indices/other/ (last visited Aug. 1, 2022).
[53] CFA Institute, *Hedge Fund Investing & Regulation*, available at https://www.cfainstitute.org/en/advocacy/issues/hedge-funds#sort=%40pubbrowsedate%20descending (last visited Aug. 1, 2022).

FIRST AMENDED COMPLAINT –
CLASS ACTION (2:22-cv-01079-JCC) – 32

ENGSTROM LEE
1330 LAGOON AVE., 4TH FLOOR
MINNEAPOLIS, MN 55416
TEL: 612-699-4703

leveraged. As a result, the consequence of underperformance or deviation from the strategy can be severe. As Callan put it in 2014:

> Investment risk plays a larger role in hedge funds than traditional asset managers due to the hedge fund's **unconstrained** nature. While a long-only equity manager mirrors the benchmark index return, plus or minus a few percentage points, **a hedge fund manager's losses can be total**. It is important to monitor a hedge fund's exposures and risks to ensure the manager is not making lopsided bets that could cause a total loss of capital.[54]

120.    Third, volatility hedge funds turn over their portfolios frequently. For example, the vast majority of options held by the Funds expired in three months or less. This means that a hedge fund's strategy and risk protections can completely change in a matter of months. Accordingly, prudent monitoring requires revisiting the risks posed by a hedge fund's current holdings every 6–18 months, depending on the circumstances, as well as in reaction to any red flags.[55]

121.    Fourth, and most importantly, traditional monitoring techniques for buy-and-hold stock and bond investment strategies are ill-suited to identifying the risks posed by a volatility hedge fund. For most buy-and-hold investments, price volatility—the extent to which the investment's price vacillates over a given period—shows how risky the fund is. But the Structured Alpha Funds were not normal funds; they were volatility hedge funds, meaning the underlying portfolios turned over frequently as the funds made changing bets on the future volatility of stock indices. The riskiness of volatility hedge funds could not be monitored by measuring past volatility.[56]

---

[54] Sally Haskins, Gary Robertson, James Veneruso, *Through the Looking Glass: Are DC Plans Ready for Alternatives?* at 5, CALLAN INVESTMENTS INSTITUTE, June 2014, available at https://www.callan.com/research/looking-glass-dc-plans-ready-alternatives/ (emphasis added) (last visited Aug. 1, 2022) (hereinafter "*Through the Looking Glass*").

[55] Cowell, *Risk Management for Derivatives*, at 236, 240 (relying on prior, historical analysis of hedge funds comprised "uniquely of options" has "limited relevance" for funds that have "high rates of turnover" and that "[r]isk analysis" of high-turnover funds invested in options "loses validity very quickly as the composition of the portfolio changes"); 1000 Plus PPM at 109 ("The fund's trading will be made on the basis of short-term market considerations, such that portfolio turnover rates will be significant."); Equity 250 PPM at 98 (same).

[56] *See* Cowell, *Risk Management for Derivatives*, at 235, 240 (noting that because "[o]ptions . . . are economically different from other instruments because they have asymmetric return distributions," in which risks manifest themselves only in the event of "meaningful scenarios or shocks," "[c]onventional risk management" consisting of analyzing risk by measuring the volatility of historical returns "lacks robustness, being valid only for very small changes in market prices and at a particular point in time.").

FIRST AMENDED COMPLAINT –
CLASS ACTION (2:22-cv-01079-JCC) – 33

**ENGSTROM LEE**
1330 LAGOON AVE., 4TH FLOOR
MINNEAPOLIS, MN 55416
TEL: 612-699-4703

122. In this sense, the Structured Alpha Funds' strategy was comparable to selling earthquake insurance. The Structured Alpha Funds generated income by writing VIX futures and options: effectively selling investors market crash insurance. And just like selling earthquake insurance, if the market stays steady, the options expire and the Funds keep the income generated by writing the options. Until an earthquake hits.

123. Notably, calamitous events are virtually inevitable in equity markets. *See supra* ¶¶ 39 & n.17, 105 & n.47 (describing the frequency of various types of market declines, including the fact that a drop of 20% or more historically occurs once every five years). A proper fiduciary review of the Funds needed to measure how the funds would react during various types of extreme market events, rather than relying on the Funds' misleadingly consistent returns. Such a review would include looking at the holdings of each fund (which were provided to Defendants monthly) and performing risk analysis including, at a minimum, Value at Risk analysis, scenario analysis and stress testing, and sensitivity analysis.[57]

124. Callan's own white paper acknowledges the extraordinary risks posed by hedge funds and the commensurate complexity and importance of monitoring those funds.

> But looking forward for higher risk-adjusted returns, investors are casting about for additional diversifying solutions such as hedge funds . . . . To be diversifying, these alternatives need to hedge market risks and amplify the desired residual risks. With the added complexity of leverage and shorting, let alone any dynamic shifts of net, long, short, and gross exposures, **the investor's task of evaluating these multi-dimensional risks, let alone monitoring them, has grown exponentially**.[58]

## DEFENDANTS' VIOLATIONS OF ERISA

### I. DEFENDANTS IMPRUDENTLY SELECTED THE STRUCTURED ALPHA FUNDS FOR THE PLANS

125. Before investing in the Structured Alpha Funds, Defendants had an obligation to perform a thorough investigation into the merits of each investment. Specifically, Defendants were required to determine whether the Funds were appropriate for the Plans in light of the

[57] See Frances Cowell, *Risk Management for Derivatives*, 12 DERIVATIVES USE, TRADING & REGULATION 228, 236 (Oct. 2006).
[58] Jim McKee, CALLAN INSTITUTE, *Hedge Fund Monitor: Puttin' on the Risk*, Q3 2018, available at https://www.callan.com/research/puttin-on-the-ritz-hedge-fund-monitor-3q18/ (emphasis added).

FIRST AMENDED COMPLAINT –
CLASS ACTION (2:22-cv-01079-JCC) – 34

ENGSTROM LEE
1330 LAGOON AVE., 4TH FLOOR
MINNEAPOLIS, MN 55416
TEL: 612-699-4703

Funds' risks, along with the Plans' income needs, risk tolerance, and time horizon. *DiFelice v. U.S. Airways, Inc.*, 397 F. Supp. 2d 758, 772–73 (E.D. Va. 2005) (quoting and citing 29 C.F.R. § 2550.404a-1(b)(2)); *Meyer v. Berkshire Life Ins. Co.*, 250 F. Supp. 2d 544, 552, 566, 573 (D. Md. 2003) (fiduciaries breached their duties by failing to consider participants' time horizon or risk tolerance in designing plan's investment strategy). This was an especially critical task here because the DC Plan offered only one investment, unlike most defined contribution plans. Participants had no way to opt out of Defendants' fund selection, regardless of how risky or reckless it was.

126. A fiduciary assessing an investment must review any critical documents associated with the investment. In this case, there was a Private Placement Memorandum and Subscription Agreement for each fund. "Reasonable diligence" in investing in the Structured Alpha Funds "does not consist of ignoring a private placement memorandum received prior to making an investment." *WA Sw. 2, LLC v. First Am. Title Ins. Co.*, 240 Cal. App. 4th 148, 157 (2015).

127. As the Private Placement Memorandum ("PPM")[59] for each Structured Alpha Fund made clear, each fund was "speculative and entail[ed] substantial risks" given each fund's use of "leverage positions" and "short exposures" that would tend to "maximize the adverse impact to which the Fund's investment portfolio may be subject."[60] And because of those risks, each Fund's PPM stated, "Investment in the Fund is suitable only for persons who can bear the economic risk of the loss of their investment . . . ."[61] This was reiterated later in each Fund's PPM, stating that to invest in each Fund, "Subscribers must have the ability and willingness to accept . . . the risk of **the potential total loss of capital** resulting from an investment in the Fund."[62] In signing the Subscription Agreement for each fund, the Board attested that it had reviewed the PPM, understood the "substantial risks of loss" associated with the Structured Alpha Funds, and had "determined that the [investment] is a suitable investment for the

---

[59] "A private placement memorandum, also known as a PPM, is a document that contains relevant disclosures about purchasing shares of a company so that the investor can evaluate the risks of a particular investment decision." *Sadler*, 2014 WL 2598804, at *22 n.20.
[60] 1000 Plus PPM at 88; Equity 250 PPM at 78.
[61] *Id.*
[62] 1000 Plus PPM at 107 (emphasis added); Equity 250 PPM at 95–96.

FIRST AMENDED COMPLAINT –
CLASS ACTION (2:22-cv-01079-JCC) – 35

**ENGSTROM LEE**
1330 LAGOON AVE., 4TH FLOOR
MINNEAPOLIS, MN 55416
TEL: 612-699-4703

Investor."[63]

128.    The PPMs' language was not mere puffery. As described above, the Structured Alpha Funds wrote highly leveraged stock market and VIX options, risking devastating losses.

129.    The Plans could not tolerate anywhere near this level of risk. The defined contribution plan (the DC Plan) consisted of a single investment option, meaning all participants were invested in the Structured Alpha Funds. A substantial portion of the DC Plan's assets were held by retirees and those near retirement. These participants could not afford a 20% drop in the value of their accounts; as such, the Structured Alpha Funds were not an appropriate investment for the Plans. The rest of America's defined contribution plans recognized as much. Of the hundreds of thousands of defined contribution plans in the United States, only one other plan invested in the Structured Alpha Funds. *See supra* ¶ 12 & n.5.

130.    The Structured Alpha Funds were similarly inappropriate for the Pension Plan. At all relevant times, the Pension Plan was approximately 82% funded—only a 2% drop away from being downgraded to endangered status. The Structured Alpha Funds were a poor fit for the Pension Plan for several reasons: the Plan's underfunded status; the fact that poor investment returns cause a reduction in benefits to Pension Plan participants; and the Plan's moderately conservative investment approach. Again, fiduciaries of similar plans recognized that the Funds were inappropriate. Not a single defined benefit plan whose benefits vary based on investment performance invested in either of the Funds. *See supra* ¶¶ 12, 32–36 (describing benefit calculation method).

131.    The Plans would be tens of millions of dollars better off had Defendants instead invested in funds that matched the Plans' investment strategy, which was to be "moderately conservative when compared to [comparable] plans."[64]

132.    Defendants replaced a significant portion of the Plans' bond portfolio with

---

[63] 1000 Plus Subscription Agreement at 12; Equity 250 Subscription Agreement at 91.

[64] Carpenters Trust of Western Washington, *Asset Allocation and Investment Manager Assignments* (4th Quarter 2020), available at https://www.carpentersbenefits.org/html/trust-summary.pdf.

FIRST AMENDED COMPLAINT –
CLASS ACTION (2:22-cv-01079-JCC) – 36

**ENGSTROM LEE**
1330 LAGOON AVE., 4TH FLOOR
MINNEAPOLIS, MN 55416
TEL: 612-699-4703

investments in 1000 Plus in 2014 and again in 2016. Had Defendants instead stayed the course by investing in a broad-based bond index fund, the Plans would have tens of millions of dollars more in assets than they presently do. For example, the Vanguard Total Bond Market Index Fund (or mutual funds or CITs tracking an aggregate bond index from providers such as Northern Trust, Fidelity, or BlackRock) had a strong, long-term record of performance at the time Defendants selected 1000 Plus for the Plans, and would have maintained the Plans' bond exposure and risk level.

133.    Likewise, when Defendants invested in Equity 250 in 2016, they ousted from the Plans roughly $150 million of public equities and about $25 million in bonds. Equity 250 sought to track the performance of the S&P 500 *and* add another 3.75% of performance using the reckless bets discussed *supra*. Had Defendants instead simply tracked the S&P 500 or Russell 1000 Index in a low-cost mutual fund or CIT in accordance with the Plans prior investments in domestic equities, the Plans would have tens of millions of dollars more in assets than they have at the present. For example, the Vanguard Russell 1000 Index Fund (or a comparable Russell 1000 Index tracker from managers such as Northern Trust, BlackRock, or Fidelity) had a strong, long-term record of performance at the time Defendants selected Equity 250 for the Plans, and would have maintained the Plans' equity exposure and risk level. Indeed, when Defendants invested the proceeds from the Structured Alpha Funds after they collapsed in 2020, they invested in an index fund tracking the Russell 1000 Index Fund.

II.    **THE STRUCTURED ALPHA FUNDS WERE PLAINLY INAPPROPRIATE FOR THE PLANS.**

134.    The Board appears to have relied on representations made by Allianz that the Funds were "structured to perform irrespective of the market environment and to never make a call on the direction of equities or of volatility" so as to "protect[] against a tail event or market crash."[65] The Board has claimed that it invested in the Funds to help "diversify the portfolio and help protect assets during just this type of equity decline."[66]

---

[65] *Board of Trustees for the Carpenters of Western Washington v. AllianzGI*, Case No. 1:20-cv-09479, ECF No. 1, Complaint (Nov. 12, 2020) (hereinafter "Board of Trustees Complaint"), ¶¶ 5, 8 (internal quotation marks omitted).
[66] Allianz FAQ at 2.

FIRST AMENDED COMPLAINT –
CLASS ACTION (2:22-cv-01079-JCC) – 37

**ENGSTROM LEE**
1330 LAGOON AVE., 4TH FLOOR
MINNEAPOLIS, MN 55416
TEL: 612-699-4703

135.     This reliance was misplaced for two reasons. First, these statements were from Allianz marketing materials and sales presentations, not the Funds' PPM and Operating Agreements. In signing the Subscription Agreement for each fund, the Board repeatedly swore that it was relying on the representations made therein, and not marketing materials. For example, the Board swore:

- that it had "carefully read and underst[ood] the Operating Agreement and the Memorandum outlining, among other things, the organization and investment objectives and policies of, and the risks and expenses of an investment in, the Fund"[67];

- that "it ha[d] made an independent decision to invest in the Fund" and in doing so "ha[d] relied **solely** upon the Memorandum, the Operating Agreement and independent investigations made by the Investor"[68]; and

- that it was "not relying on the Fund or [Allianz] . . . with respect to the legal, tax and other economic considerations involved in this investment other than the Investor's own advisers."[69]

Because the Board swore it would not do so, it should not have relied upon representations regarding the Funds contained in marketing materials or sales presentations.

136.     Second, the Funds' PPM and Operating Agreements directly undermined the Allianz marketing representations that the Board apparently relied on. For example, the Board apparently believed that the Funds offered "protection against a tail event or market crash."[70] But the Funds' Operating Agreement and PPM repeatedly stated the opposite, emphasizing:
- the risk of "total loss" of one's investment;[71]
- that "[t]here can be no assurance that the Fund will . . . avoid substantial losses";[72] and

- that "[a]n investor should not make an investment in the Fund with the expectation of sheltering income."[73]

137.     The Funds' PPMs also should have dispelled the Board's misconception that the Funds were somehow "market neutral." The 1000 Plus PPM made clear that Allianz "expects

---

[67] 1000 Plus Subscription Agreement at 11; Equity 250 Subscription Agreement at 90.
[68] *Id.* (emphasis added).
[69] *Id.*
[70] Board of Trustees Complaint ¶ 8.
[71] 1000 Plus PPM at 107; Equity 250 PPM at 96.
[72] 1000 Plus PPM at 87; Equity 250 PPM at 144.
[73] *Id.*

FIRST AMENDED COMPLAINT –
CLASS ACTION (2:22-cv-01079-JCC) – 38

**ENGSTROM LEE**
1330 LAGOON AVE., 4TH FLOOR
MINNEAPOLIS, MN 55416
TEL: 612-699-4703

that the performance of the Fund's Futures Component will be correlated to the performance of the VIX"[74] and that "Success [of the Fund] depends on [Allianz's] ability to select individual securities, to correctly interpret market data, to **predict future market movements** and otherwise to implement the Fund's investment strategies."[75] Were the Funds indeed market and volatility neutral, as the Board apparently believed, there would be no need to successfully predict the direction of markets, nor would performance be correlated with that of the VIX.

138.    Further, Defendants had no historical basis to believe that the Funds could successfully weather a significant market event. The Funds' marketing materials touted performance during prior market downturns, prior to the Funds' creation. As a consequence, Allianz's claims were based on back-testing performed by Allianz, where a model was used to simulate how the Funds would have performed during those prior events. But these models are notoriously unreliable, especially as applied to complex trading strategies such as those employed by the Funds. This is because trading strategies are generally *designed* based on prior events, guaranteeing that the strategy will perform well when back-tested against past market events.[76] The Board therefore relied on Allianz marketing materials that were both contradicted by the Funds' core documents and unverified in the real world.

139.    Based on these facts, it is reasonable to infer that the process that led to the selection of the Funds for the Plans, and the investment of more than $250 million of the Plans' assets in the Funds, was imprudent.

---

[74] 1000 Plus PPM at 108. Defendant Callan was aware of this correlation, stating in its report to the Alaska Retirement Management Board in September 2014 (one month after the Plans' first investment in the Funds) that "[p]erhaps the most notable performance pattern generated by the [Funds] is the sudden decline that occurs during spikes in the VIX Index over short periods of time." Alaska Management Retirement Board, Sept. 18–19, 2014 Board of Trustees Meeting Packet at page 548, available at https://treasury.dor.alaska.gov/docs/treasurydivisionlibraries/armb/meetings-minutes/board-of-trustees/meeting-packets/2014/2014_09-18_19packet.pdf?sfvrsn=3968625_3.

[75] 1000 Plus PPM at 108 (emphasis added). *See also id.* at 111; Equity 250 PPM at 96, 99.

[76] *See* Investment Advisers Act Release No. 5653, at 210 (Dec. 22, 2020), available at https://www.sec.gov/rules/final/2020/ia-5653.pdf ("Because [back-tested] performance is calculated after the end of the relevant period, it allows an adviser to claim credit for investment decisions that may have been optimized through hindsight, rather than on a forward-looking application of stated investment methods or criteria and with investment decisions made in real time and with actual financial risk. For example, an investment adviser is able to modify its investment strategy or choice of parameters and assumptions until it can generate attractive results and then present those as evidence of how its strategy would have performed in the past.").

FIRST AMENDED COMPLAINT –
CLASS ACTION (2:22-cv-01079-JCC) – 39

**ENGSTROM LEE**
1330 LAGOON AVE., 4TH FLOOR
MINNEAPOLIS, MN 55416
TEL: 612-699-4703

140.     By selecting funds that were facially inappropriate for the Plans, the Board breached its fiduciary duty to exercise the care, diligence, prudence, and skill that a prudent fiduciary would have exercised under similar circumstances.

141.     Similarly, by recommending to the Board that the Plans invest in the Funds, Callan failed to take into account the circumstances of the Plans and their participants. Accordingly, Callan failed to exercise the level of care, diligence, skill, and prudence expected of a fiduciary under similar circumstances and thereby breached its fiduciary duties.

### III.   DEFENDANTS FAILED TO PRUDENTLY MONITOR THE PLANS' INVESTMENTS

142.     Even if it had been prudent to make an initial investment in the Structured Alpha Funds, a fiduciary "cannot assume" that "they will remain so indefinitely." *Tibble*, 575 U.S. at 529. Instead, fiduciaries must "systematically consider all the investments [in the plan] at regular intervals to ensure they remain appropriate." *Id.* This review must ensure the investment continues to meet "the needs of the plan," which necessarily turn on the "facts and circumstances that the fiduciary knows or should know are relevant to the particular investment," including both the nature of the investment and the purpose the investment serves within the plan. *Scalia v. WPN Corp.*, 417 F. Supp. 3d 658, 670 (W.D. Pa. 2019) (quoting 29 C.F.R. § 2509.75–8; 29 C.F.R. § 2550.404a-1).

143.     Here, the purpose of the investment is already known from the Board's own statements. The Board told participants that it selected the Funds "to diversify the portfolio and help protect assets during [an] equity decline."[77]

144.     In light of these objectives, Defendants were required to monitor whether the Funds (1) would protect against losses during equity market downturns; (2) provided meaningful diversification vis-à-vis the Plans' equity investments; (3) maintained the same risk from the time of the Plans' original investment; and (4) were performing in line with expectations.

145.     Appropriately monitoring these volatility hedge funds required far more than

[77] Allianz FAQ at 2.

FIRST AMENDED COMPLAINT –
CLASS ACTION (2:22-cv-01079-JCC) – 40

**ENGSTROM LEE**
1330 LAGOON AVE., 4TH FLOOR
MINNEAPOLIS, MN 55416
TEL: 612-699-4703

simply monitoring returns. For most investments, price volatility shows how risky a fund is. But as described *supra* ¶¶ 114–21, the risks associated with volatility hedge funds cannot be measured by analyzing periodic performance results because volatility hedge funds generate almost no volatility except for when a calamitous event occurs.[78]

146.    Given that the Funds constituted almost 20% of the Plans' assets, Defendants should have performed portfolio analysis and risk analysis of the Funds at least every six months, as well as in reaction to any red flags.[79] The Funds were complex, risked a total investment loss, turned over their holdings frequently, and held a substantial percentage of the Plans' assets. Accordingly, Defendants' monitoring responsibilities were even more demanding than for less complex funds. *See Harley v. Minnesota Mining & Mfg. Co.*, 42 F. Supp. 2d 898, 902 n.6 (D. Minn. 1999) (quoting ERISA expert opining that "[b]ecause the . . . investment involved complex, illiquid and volatile financial instruments and because the strategy was novel . . . the Plan fiduciaries had a heightened responsibility to discover and understand how the investment was performing and whether the stated strategy and methodology was being followed by the manager.").

147.    The Board's own commentary strongly suggests that no meaningful monitoring was taking place other than looking at periodic performance results. The Board justified its retention of the Funds by claiming that "[u]ntil February of 2020, AllianzGI funds had performed well."[80] This demonstrates a fundamental lack of understanding of the asymmetric return distributions associated with volatility hedge funds, and of the type of monitoring necessary to accurately assess the Funds' risk and comportment with the Plans' investment objectives.

148.    Of course, the Board was not the only party with monitoring responsibilities. As

---

[78] *See supra* at ¶ 117 & n.52.

[79] Cowell, *Risk Management for Derivatives*, at 236, 240 (relying on prior, historical analysis of hedge funds comprised "uniquely of options" has "limited relevance" for funds that have "high rates of turnover" and that "[r]isk analysis" of high-turnover funds invested in options "loses validity very quickly as the composition of the portfolio changes"); 1000 Plus PPM at 109 ("The fund's trading will be made on the basis of short-term market considerations, such that portfolio turnover rates will be significant."); Equity 250 PPM at 98 (same).

[80] Allianz FAQ at 1.

FIRST AMENDED COMPLAINT –
CLASS ACTION (2:22-cv-01079-JCC) – 41

**ENGSTROM LEE**
1330 LAGOON AVE., 4TH FLOOR
MINNEAPOLIS, MN 55416
TEL: 612-699-4703

the Plans' fiduciary consultant, Callan was obligated to monitor whether the Funds were suitable for the Plans. This obligation was heightened by the fact that Callan had recommended the Structured Alpha Funds in the first place and was receiving $360,000 per year in consulting fees. Callan also touted its decades of experience analyzing hedge funds, further ensuring clients that as a consultant, Callan would monitor those investments and educate clients about them.

149.    Callan was acutely aware of the importance of closely monitoring the risks posed by hedge fund investments. *See Through the Looking Glass* at 5 ("Investment risk plays a larger role in hedge funds than traditional asset managers due to the hedge fund's unconstrained nature."). As a consequence, Callan warned that "[i]t is important to monitor a hedge fund's exposures and risks to ensure the manager is not making lopsided bets that could cause a total loss of capital." *Id.*

150.    Thus, Callan had an ongoing duty to monitor whether the Funds were continuing to meet the Plans' diversification and risk protection goals given the unique risk of volatility hedge funds, the Plans' disproportionate investment in those Funds, and the exorbitant consulting fee Callan was being paid to perform this task.[81]

151.    Defendants failed to properly monitor the Funds. By 2018, there were already significant warning signs that the Funds were not providing diversification from equity markets or protection against market crashes, and therefore departed from the Plans' objectives. These warnings multiplied and intensified through 2018 and 2019, and would have been apparent to a prudent fiduciary long before the Funds suffered irreversible losses in 2020.

152.    Had Defendants conducted the necessary monitoring, they would have seen that the Funds were no longer meeting the Plans' objectives: diversification from equity markets and protection against market crashes. But because Defendants failed to prudently monitor the

---

[81] The need for robust, external risk-monitoring was heightened by the Funds' fee structure. In another departure from how retirement plan investment options usually work, Allianz received zero guaranteed management fee. Rather, Allianz was compensated only if the Funds outperformed their benchmark index. As a consequence, Allianz was incentivized to pursue aggressive trading strategies in order to collect its enormous performance fees (20–30% of performance above benchmark). 1000 Plus PPM at 91–92; Equity 250 PPM at 81–82.

FIRST AMENDED COMPLAINT –
CLASS ACTION (2:22-cv-01079-JCC) – 42

ENGSTROM LEE
1330 LAGOON AVE., 4TH FLOOR
MINNEAPOLIS, MN 55416
TEL: 612-699-4703

Funds, Defendants failed to recognize contemporaneous warning signs and divest from the Funds in a timely manner. By the time Defendants realized their assumptions about the Funds were incorrect, it was too late.

153.    The missed warning signs came in three primary categories: the Funds' mirroring of the stock market's direction, the Funds' dangerous holdings, and the Funds' outlier status as compared to their peer funds.

**A.    Deteriorating Diversification**

154.    The Funds' failure to provide diversification for the Plans would have been evident to a fiduciary monitoring the Funds with diligence and care. As noted above, the primary purpose of the Plans' investment in the Funds was "to diversify the portfolio and help protect assets during [a severe] equity decline."[82] The protection offered by 1000 Plus was easily measured by the correlation between fund performance and stock market performance. For Equity 250, the same correlation analysis should have been performed on the Fund's alpha component. An investment provides protection from an equity decline if the investment's returns are positive when the market's returns are negative. If the direction of a fund's performance matches the direction of market returns, the fund will not protect investors during a market downturn.

155.    By 2018 it was apparent that neither Equity 250 nor 1000 Plus were providing any diversification benefit to the Plans. Beginning in April 2018, for 24 consecutive months Equity 250 outperformed the S&P 500 only when the market was up, and underperformed the S&P 500 during every down month.

156.    The performance of 1000 Plus was similarly alarming. For example, in February 2018, as the market dropped and volatility spiked, 1000 Plus lost 10% in one month. This should have been highly concerning to Defendants, as it demonstrated that 1000 Plus was not providing a diversification benefit, but instead was highly correlated with the direction of equity markets.

---

[82] Allianz FAQ at 2.

FIRST AMENDED COMPLAINT –
CLASS ACTION (2:22-cv-01079-JCC) – 43

157. These red flags were not hard to spot for a fiduciary doing its job competently. Indeed, in April 2019, the Alaska Retirement Review Board (the "Alaska Board") terminated its entire $242 million investment in the 1000 Plus strategy for this very reason, noting that "the strategy has a high correlation to equity market drawdowns."[83] The Alaska Board continued, "Given the correlation to equity drawdowns — a significant risk already contained in the broader portfolio — and to this uncertainty, staff recommends redeeming from the strategy."[84]

158. The Alaska Board's actions show what a prudent fiduciary would do when confronted with the Funds' failures at diversification. Accordingly, a prudent fiduciary that relied on the funds for diversification would have known to divest from the Funds at least a year before the 2020 crash occurred. *See Tibble*, 575 U.S. at 530 ("[I]f an investment is determined to be imprudent, the trustee 'must dispose of it within a reasonable time[.]'") (quoting BOGERT & BOGERT LAW OF TRUSTS AND TRUSTEES § 685, at 156–57 (3d ed. 2009)).

159. As the investment consultant to the Alaska Board, Callan was uniquely aware of these risks. Before the Alaska Board invested in 1000 Plus, Callan prepared a Research Note that endorsed the Fund. The Alaska Board then invested in 1000 Plus, predating the Plans' initial investment. At a subsequent Alaska Board meeting, Callan questioned the Fund's managers about strategies for achieving low correlation with equity markets. Accordingly, Defendant Callan was well-acquainted with the Funds and their design.

160. Further, Defendant Callan was present at the Alaska Board meeting when the Alaska Board decided to terminate its investment in 1000 Plus. The Alaska Board and the Plans were two of only six total investors in 1000 Plus,[85] and Callan advised them both. Notwithstanding Defendants' independent obligations to monitor the Plans' investments, the Alaska Board meeting put Callan on further notice of the Funds' increased correlation with

---

[83] Alaska Retirement Mgmt. Bd. Action Memo, Allianz Structured Alpha 1000 Plus (Apr. 4–5, 2019) at 433, https://treasury.dor.alaska.gov/Portals/3/docs/meetings_minutes/board%20packets/2019/ARMB%20BOT%20Packet%20-%2004.04-05.19%20FINAL%20Updated%204.9.19.pdf?ver=2019-04-09-080644-013&timestamp=1637358947974#page=433.

[84] *Id.*

[85] AllianzGI Structured Alpha 1000 Plus LLC, SEC Form D (2019), available at https://sec.report/Document/0001555565-19-000001/.

FIRST AMENDED COMPLAINT –
CLASS ACTION (2:22-cv-01079-JCC) – 44

**ENGSTROM LEE**
1330 LAGOON AVE., 4TH FLOOR
MINNEAPOLIS, MN 55416
TEL: 612-699-4703

equity markets and deteriorating utility as a diversifier.

161.   After this meeting, Callan should have immediately evaluated whether 1000 Plus still served the Plans' objectives. A cursory review would have revealed that the Plans, like the Alaska Board, needed to divest. Instead, Callan failed to take any action.

**B.   Holdings Data Demonstrated Lack of Protection Against Downturns**

162.   Defendants' apparent belief that the Funds would protect against market declines was disprovable by simply monitoring the periodic holdings data provided to Defendants. Defendants' apparent erroneous belief in the Funds' downside protection appears to be based on Allianz marketing materials stating that the Funds' hedging positions were designed to protect the strategy from a short-term equity market crash by purchasing laddered equity market puts at strike prices between -10% and -25% of current market levels.[86]

163.   However, Callan and the Board received monthly reports from Allianz that detailed every security held by the Structured Alpha Funds. Defendants could have used this information to determine whether the Funds were in fact positioned to protect against market declines and volatility spikes.

164.   Had Defendants analyzed the holdings, they would have seen that the Funds were not crash protective but, rather, the reverse—highly exposed to losses during a period of market stress. As the SEC Consent Order documents, an analysis of these holdings would have shown that from 2017 onward, none of the Funds' hedging positions had strike prices higher than -25% of current market levels.[87] Beginning in 2018, strike prices averaged between -30% to -50% of current market levels.[88]

---

[86] Allianz Global Investors U.S. LLC Securities & Exchange Commission Consent Order at ¶ 9, May 17, 2022, available at https://www.sec.gov/litigation/admin/2022/34-94927.pdf (hereinafter "SEC Consent Order").
[87] SEC Consent Order at ¶ 10.
[88] *Id.*

FIRST AMENDED COMPLAINT –
CLASS ACTION (2:22-cv-01079-JCC) – 45

**ENGSTROM LEE**
1330 LAGOON AVE., 4TH FLOOR
MINNEAPOLIS, MN 55416
TEL: 612-699-4703



*Id.* None of this data was concealed or altered. In fact, the above graph was constructed using data sent to Defendants every month they were invested in the Funds.

165. If Defendants had prudently monitored the Funds' holdings, they would have seen that the Funds were not hedged against even a normal market decline, much less a major drawdown amid continuing volatility. Similarly, the Funds' positions in volatility options were positioned to decline in value if there was an increase in volatility.

166. Had Defendants conducted routine holdings analysis, they would have discovered well before March 2020 that the Structured Alpha Funds were no longer appropriate investment for the Plans, because they were not providing any diversification benefit or protection against market downturns. Rather, the Funds were effectively gambling by selling an immense amount of high-premium option insurance both in S&P 500 put options and naked VIX call options. In addition, the supposed "protection" provided by the Funds' put options was meaningless because those options had strike prices that were too low (and maturities that were too short-dated) to actually be useful in a market crash. While this positioning nominally adhered to Allianz's prior promise to "[b]uy put options—in a greater quantity than sold," this "crash protection" was effectively cosmetic window dressing.

167. The Board has even acknowledged that the Funds' disastrous performance in March 2020 was foreseeable to an investment fiduciary exercising reasonable care. The Board's Complaint against Allianz stated that performing a "very basic" stress test in January 2020

FIRST AMENDED COMPLAINT –
CLASS ACTION (2:22-cv-01079-JCC) – 46

**ENGSTROM LEE**
1330 LAGOON AVE., 4TH FLOOR
MINNEAPOLIS, MN 55416
TEL: 612-699-4703

would have shown how the Funds would react to lower market value and higher volatility."[89] Such stress test results "would have made clear both the losses that would result from the Alpha Funds' positioning, and the fact that the Alpha Funds were extraordinarily exposed to a short volatility event."[90] While the Board's Complaint limited its analysis to January 2020, the same test performed in 2019 would have revealed the same result. This "very basic" test should have been a core feature of Defendants' monitoring of the Structured Alpha Funds.

168.    A prudent fiduciary would have conducted routine monitoring of the Structured Alpha Funds by not only monitoring the performance of the Funds, but also analyzing their holdings and testing to ensure that the Funds remained appropriate for the Plans. Defendants' retention of these investments through April 2020 demonstrates that they were not conducting the monitoring that a prudent fiduciary would have performed. Had Defendants done this monitoring, they would have removed the Funds from the Plan much earlier.

## C.    Peer Groups Demonstrate the Funds' Exceptional Riskiness

169.    Benchmarks are a well-established tool to measure a fund's performance and risk.[91] Due to the particularities of their investment strategy and underlying securities, the risk of a volatility hedge fund is generally measured through peer group comparisons.[92] Accordingly, Defendants could have analyzed the Funds' peer groups to determine whether the Funds were fulfilling the Board's mandate: diversification and crash protection.

170.    Take the 1000 Plus Fund as an example. That fund had two readily available peer groups. First, HFR identified the 50–100 volatility hedge funds in the marketplace and aggregated them on an equal basis, forming the HFRI RV Volatility Index. *See supra* ¶ 112. Second, Cboe identified a subset of those volatility hedge funds that used a "Relative Value" strategy and aggregated them on an equal basis, forming the Cboe Eurekahedge Relative Value

---

[89] Board of Trustees Complaint ¶ 108.
[90] *Id.*
[91] Laurence Siegel, *Benchmarks and Investment Management* at xii, CFA RESEARCH FOUNDATION (2003) ("Plan sponsors and consultants also can't live without benchmarks . . . . Performance measurers seek benchmarks the way bees seek honey.") (internal quotation marks omitted) (hereinafter "*Benchmarks and Investment Management*").
[92] *Id.* at 112, 115. A peer group is a group of investments that use similar strategies.

FIRST AMENDED COMPLAINT –
CLASS ACTION (2:22-cv-01079-JCC) – 47

ENGSTROM LEE
1330 LAGOON AVE., 4TH FLOOR
MINNEAPOLIS, MN 55416
TEL: 612-699-4703

Volatility Index.[93] *See id.*[94]

171. These peer groups illustrate the Funds' extraordinary riskiness, even relative to similar funds. As described above, price volatility—the standard measure of a fund's risk—is not a reliable guide to the riskiness of volatility hedge funds. *See supra* ¶ 118. However, the riskiness of volatility hedge funds (compared to other such funds) can be assessed by other means. First, as discussed above, a fiduciary should iteratively assess the fund's protection against extreme market events by analyzing the fund's underlying holdings. *See supra* ¶¶ 117, 156–62. Second, a fund's risk can be assessed through peer group comparisons.[95]

172. Unlike most stock or bond funds, a volatility hedge fund selects from an extremely limited set of underlying securities: a few equity and volatility indices. This virtually eliminates security selection as a driver of performance. Instead, the performance of a volatility hedge fund is driven by two fundamental factors: the direction of the fund's bet on volatility and the net income produced by the fund's option-writing and hedging. Because most Relative Value funds made similar directional bets during the relevant period, this second factor—net income—was a critical means of distinguishing among peer funds.

173. Net income is calculated by taking the income generated by the options written by the fund *minus* the cost of the hedging positions purchased by the fund. Both components are directly tied to risk level. Writing options generates more income when the options are closer to the current market level and have a more distant expiration date.[96] As a fund's income increases, so does its risk. Hedging positions cost less when they are further from the current market level and have a closer expiration date. Again, each of these attributes erodes the fund's protection against extreme market events, thereby increasing the riskiness of the fund.

174. Defendants thus could have assessed the Funds' risk level compared to other

[93] Cboe, *Four Cboe Eurekahedge Volatility Indexes*, available at https://www.cboe.com/us/indices/benchmark_indices/other/ (last visited Aug. 1, 2022).
[94] With certain modifications, a similar analysis could have been performed for Equity 250.
[95] *Benchmarks and Investment Management* at 28.
[96] For example, a put that allows you to buy an equity index future at 35% below the current market level is many times cheaper than a put allowing you to buy the same future at 5% below the current market level.

FIRST AMENDED COMPLAINT –
CLASS ACTION (2:22-cv-01079-JCC) – 48

**ENGSTROM LEE**
1330 LAGOON AVE., 4TH FLOOR
MINNEAPOLIS, MN 55416
TEL: 612-699-4703

volatility hedge funds by comparing the Funds' absolute returns (*not* price volatility) to the returns of their peers. As shown below (using the Structured Alpha 1000 Fund—which employed a similar strategy to 1000 Plus), the Structured Alpha Funds' returns were anomalous relative to their peers.



**Annualized Return, %**

Allianz Structured Alpha: Performance

vs. RV Volatility Hedge Funds; as of January 2020

*Source of data: Eurekahedge, HFR

175.    While high returns are of course welcome, these returns were not a free lunch, as described above. In fact, these returns meant the fund was far more susceptible to large losses during extreme market events than its peers.

176.    This may have been an acceptable tradeoff for certain investors. However, it was inappropriate for the Plans given their investment objectives of diversification and protection against market downturns. *See supra* ¶¶ 14, 43–48.

177.    Callan was ideally positioned to analyze this data. Callan possessed the relevant benchmark and peer data and the expertise to analyze it. Had Callan performed benchmark and peer comparisons from the perspective of risk, Callan would have seen that 1000 Plus and Equity 250 were among the riskiest volatility hedge funds on offer. As such, these Funds were

FIRST AMENDED COMPLAINT –
CLASS ACTION (2:22-cv-01079-JCC) – 49

**ENGSTROM LEE**
1330 LAGOON AVE., 4TH FLOOR
MINNEAPOLIS, MN 55416
TEL: 612-699-4703

inappropriate for the Plans, and certainly should not have been given 18 percent of the Plans' assets.

178.    These benchmark comparisons illustrate another deficiency in Defendants' fiduciary process. As shown above, there were dozens of other volatility hedge funds in the marketplace. When deciding whether to select, retain, or remove a plan investment, the duty of prudence requires that fiduciaries "obtain[] relevant information about . . . the nature and characteristics of available investment alternatives." Restatement (Third) of Trusts § 90, cmt. d ("The trustee must give reasonably careful consideration to both the formulation and the implementation of an appropriate investment strategy, with investments to be selected and reviewed in a manner reasonably appropriate to that strategy."); *see also* Dep't of Labor Advisory Op. No. 88-16A, 1988 WL 222716, at *3. Had Defendants conducted an investigation of alternative volatility hedge funds in the marketplace, they would have identified numerous options that offered better diversification and protection from market downturns, and thus would have been superior options for the Plans. Defendants' selection of the Structured Alpha Funds demonstrates that Defendants failed to prudently investigate marketplace alternatives to the Funds, both when initially selecting them and subsequently monitoring them. Thus, Defendants have breached their duty of prudence.

## IV.   LOSSES TO THE PLANS

179.    In the first quarter of 2020, Equity 250 lost 56% of its value, while 1000 Plus lost 92% of its value. According to the Board, the Plans lost approximately $250 million as a result of their investment in the Structured Alpha Funds.

180.    On March 25, 2020, Allianz announced the liquidation of 1000 Plus. Only after the liquidation had occurred did Callan recommend that the Plans terminate all investments in the Structured Alpha Funds. On April 7, 2020, Carpenters Trusts (the trust holding both Plans' assets) filed notices of redemption to withdraw all of their remaining investments from Alpha 250. This request was effectuated on the next redemption date, April 30, 2020.

181.    This loss has caused direct financial harm to the Plans' participants. DC Plan

FIRST AMENDED COMPLAINT –
CLASS ACTION (2:22-cv-01079-JCC) – 50

participants' account balances are dependent on the performance of the DC Plan. Thus, DC Plan participants bore the Funds' losses directly. And as discussed above, a portion of the benefits received by participants of the Pension Plan also fluctuates with the performance of the Pension Plan.

182. In November 2020, the Board filed suit against Allianz for violating ERISA, and also brought claims for common law breach of fiduciary duty, negligence, and breach of contract.[97] This was one of at least 12 lawsuits brought against Allianz related to its management of the Structured Alpha Funds. Allianz settled the Board's suit in February 2022 as part of a global settlement.[98]

183. The Plans received $110,390,267 net of attorneys' fees (divided pro rata between the two plans), representing less than 45% of Plaintiffs' losses. Though it is a good first step, this settlement has not made the Plans whole. Even after the settlement proceeds are taken into account, the Plans' investments earned only 4.2% in 2020, compared to the average defined contribution plan which earned roughly 15% in 2020. Factoring in the settlement proceeds, the Plans remained among the worst-performing plans in the country for 2020. Nor was this low point counterbalanced by outperformance in prior years. Rather, the Plans' 5-year average performance as of the end of 2020 ranked in the bottom 10% among peer plans on both an absolute and risk-adjusted basis.

184. The losses have had a long-term impact on participants' benefits as well. Even after adjusting for settlement proceeds, the Plans' investment returns from 2016–2020 are in the bottom 10% of all defined contribution plans on both an absolute and risk-adjusted basis. Plaintiffs will still lose hundreds of dollars a year in pension benefits compared to what they would have received had Defendants not breached their fiduciary duties.

185. Allianz entered into a separate settlement with the SEC in May 2022, in which

---

[97] *See* Board of Trustees Complaint.

[98] PENSIONS & INVESTMENTS, *Allianz Sets Aside $4.2 Billion for Structured Alpha Lawsuits, Probes* (Feb. 18, 2022), available at https://www.pionline.com/courts/allianz-sets-aside-42-billion-structured-alpha-lawsuits-probes.

FIRST AMENDED COMPLAINT –
CLASS ACTION (2:22-cv-01079-JCC) – 51

Allianz admitted that it had provided altered, incorrect data to certain investors in its funds.[99] This incorrect data was provided to other investors, not to the Board.

186.    In fact, parts of the SEC settlement show how the Board and Callan were derelict in their duties with regard to fund monitoring. As to certain options bought by the Funds, the settlement notes that the Funds' hedges were far out of the money, meaning the hedges were unlikely to provide any actual protection to investors if the market crashed.[100] This information was available to Defendants at any time from the Funds' holdings reports that were emailed to both the Board and Callan every month. Yet the Board continued to wrongly believe that the Funds would "help protect assets during just this type of equity decline" until it was too late.[101]

## V.    PLAINTIFFS LACKED KNOWLEDGE OF MATERIAL FACTS PRIOR TO SUIT

187.    Plaintiffs did not have knowledge of all material facts (including, among other things, the asset allocation of the Plans compared to similar plans, the underlying investments utilized by the Plans, and Defendants' failure to re-evaluate the Plans' investments) until shortly before this suit was filed. Further, Plaintiffs do not have actual knowledge of the specifics of Defendants' decision-making processes with respect to the Plans (including Defendants' processes for selecting, monitoring, and removing the Funds) because this information is solely within the possession of Defendants prior to discovery. For purposes of this Complaint, Plaintiffs have drawn reasonable inferences regarding these processes based upon (among other things) the facts set forth above.

## PLAN-WIDE RELIEF

188.    29 U.S.C. § 1132(a)(2) authorizes any participant or beneficiary of the Plans to bring an action individually on behalf of the Plans to obtain for the Plans the remedies provided by 29 U.S.C. § 1109(a). Plaintiffs seek recovery on behalf of the Plans pursuant to this statutory provision.

189.    Plaintiffs seek recovery for injuries to the Plans sustained as a result of the

[99] SEC Consent Order at ¶ 2.
[100] Id. ¶ 10.
[101] Allianz FAQ at 2.

FIRST AMENDED COMPLAINT –
CLASS ACTION (2:22-cv-01079-JCC) – 52

**ENGSTROM LEE**
1330 LAGOON AVE., 4TH FLOOR
MINNEAPOLIS, MN 55416
TEL: 612-699-4703

aforementioned breaches of fiduciary duties during the statutory period commencing in 2016. *See* 29 U.S.C. § 1113(1) (setting six-year statute of limitations for ERISA breach of fiduciary duties claims in the absence of actual knowledge).

190.    Plaintiffs are adequate to bring this derivative action on behalf of the Plans, and their interests are aligned with those of the Plans' participants and beneficiaries. Plaintiffs do not have any conflicts of interest with any participants or beneficiaries that would impair or impede their ability to pursue this action. Plaintiffs have retained counsel experienced in ERISA litigation, and intend to pursue this action vigorously on behalf of the Plans.

## CLASS ACTION ALLEGATIONS

191.    Plaintiffs seek certification of this action as a class action pursuant to Federal Rule of Civil Procedure 23 and ERISA's derivative action provisions, 29 U.S.C. § 1109 and 1132(a)(2).

192.    29 U.S.C. § 1132(a)(2) authorizes any participant or beneficiary of a plan to bring an action individually on behalf of the plan to seek the remedies provided by 29 U.S.C. § 1109(a). In addition, 29 U.S.C. § 1132(a)(3) authorizes any participant or beneficiary to bring suit for injunctive or other equitable relief. Plaintiffs seek certification of this action as a class action pursuant to these statutory provisions and Fed. R. Civ. P. 23.

193.    Plaintiffs assert their claims against Defendants on behalf of a class of participants and beneficiaries of the Plans defined as follows:[102]

> All participants and beneficiaries of the Carpenters Individual Account Pension Plan of Western Washington and its successor plan at any time from August 2, 2016 to the present, and all participants and beneficiaries of the Carpenters Retirement Plan of Western Washington and its successor plan who have earned Sustainable Income Benefits at any time from January 1, 2017 to the present, excluding any person with responsibility for the Plans' investment or administrative functions.

---

[102] Plaintiffs reserve the right to propose other or additional classes or subclasses in their motion for class certification or subsequent pleadings in this action.

FIRST AMENDED COMPLAINT –
CLASS ACTION (2:22-cv-01079-JCC) – 53

**ENGSTROM LEE**
1330 LAGOON AVE., 4TH FLOOR
MINNEAPOLIS, MN 55416
TEL: 612-699-4703

194. Numerosity: The Class is so numerous that joinder of all Class members is impracticable. During the putative Class period, the Plans had at least 15,000 participants.

195. Typicality: Plaintiffs' claims are typical of the Class members' claims. Like other Class members, Plaintiffs participated in the Plans and have earned Sustainable Income Benefits in the Pension Plan since 2017, were invested in the Structured Alpha Funds, and have suffered injuries as a result of Defendants' mismanagement of the Plans. Defendants treated Plaintiffs consistent with other Class members with regard to the Plans—during all relevant periods, Plaintiffs were exposed to the exact same investment mix as all other members of the Class. Defendants managed the Plans as a single entity, and therefore Defendants' imprudent acts and omissions with respect to the Funds affected all Class members similarly.

196. Adequacy: Plaintiffs will fairly and adequately protect the interests of the Class. Plaintiffs' interests are aligned with the Class that they seek to represent, and they have retained counsel experienced in complex class action litigation, including ERISA class action litigation. Plaintiffs do not have any conflict of interest with any Class members that would impair or impede their ability to represent other Class members.

197. Commonality: Common questions of law and fact exist as to all Class members, and predominate over any questions solely affecting individual Class members, including but not limited to:

A. Whether the Board and its members are fiduciaries of the Plans, and the scope of their fiduciary duties;

B. Whether Callan was acting as a fiduciary of the Plans as it relates to its recommendation and (purported) monitoring of the Structured Alpha Funds;

C. Whether the Plans' fiduciaries breached their fiduciary duties under 29 U.S.C. § 1104 by engaging in the conduct described herein;

D. Whether Callan or the Board are liable as co-fiduciaries under 29 U.S.C. § 1105 by any breaches of fiduciary duty by the other;

FIRST AMENDED COMPLAINT –
CLASS ACTION (2:22-cv-01079-JCC) – 54

E.   Whether Callan or the Board are liable as co-fiduciaries under 29 U.S.C. § 1105 for any breach of fiduciary duty by Allianz Global Investors;

F.   Whether Callan, if found not to be an ERISA fiduciary, is liable under common law for either breach of fiduciary duty or professional negligence;

G.   The proper form of equitable and injunctive relief; and

H.   The proper measure of monetary relief.

198.   Class certification is appropriate under Fed. R. Civ. P. 23(b)(1)(A) because prosecuting separate actions against Defendants would create a risk of inconsistent or varying adjudications with respect to individual Class members that would establish incompatible standards of conduct for Defendants.

199.   Class certification is also appropriate under Fed. R. Civ. P. 23(b)(1)(B) because adjudications with respect to individual Class members, as a practical matter, would be dispositive of the interests of the other persons not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests. Any award of equitable relief by the Court would be dispositive of non-party participants' interests. The accounting and restoration of the Plans' assets that would be required under 29 U.S.C. §§ 1109 and 1132 would be similarly dispositive of the interests of other Plan participants.

200.   Class certification is also appropriate under Fed. R. Civ. P. 23(b)(3) because questions of law and fact common to the Class predominate over any questions affecting only individual Class members, and because a class action is superior to other available methods for the fair and efficient adjudication of this litigation. Defendants' conduct as described in this Complaint applied uniformly to all Class members. Class members do not have an interest in pursuing separate actions against Defendants, as the amount of each Class member's individual claims is relatively small compared to the expense and burden of individual prosecution, and Plaintiffs are unaware of any similar claims brought against Defendants by any Class members on an individual basis. Class certification also will obviate the need for unduly duplicative

FIRST AMENDED COMPLAINT –
CLASS ACTION (2:22-cv-01079-JCC) – 55

**ENGSTROM LEE**
1330 LAGOON AVE., 4TH FLOOR
MINNEAPOLIS, MN 55416
TEL: 612-699-4703

litigation that might result in inconsistent judgments concerning Defendants' practices. Moreover, management of this action as a class action will not present any likely difficulties. In the interests of justice and judicial efficiency, it would be desirable to concentrate the litigation of all Class members' claims in a single forum.

**COUNT I**

**Breach of Duty of Prudence**
**29 U.S.C. § 1104**
**As to All Defendants**

201.    Defendants are fiduciaries of the Plan under 29 U.S.C. §§ 1002(21) and/or 1102(a)(1). See supra ¶¶ 49–51, 63.

202.    29 U.S.C. § 1104 imposes a duty on Defendants to exercise expected levels of care, diligence, skill, and prudence in their administration of the Plans and in selecting and monitoring the Plans' investments.

203.    Among other things, Defendants are responsible for maintaining investments that would meet the needs of participants, prudently selecting quality investment options, evaluating and monitoring the Plans' investments on an ongoing basis and eliminating imprudent ones, ensuring that the Plans' fees are reasonable, and taking all necessary steps to ensure that the Plans' assets are invested prudently.

204.    As described throughout this Complaint, Defendants breached their fiduciary duties by investing the Plans' assets in the Structured Alpha Funds, despite the fact that the Funds were not appropriate investments for the Plans in light of the nature of the Plans and the financial situation of their participants. Defendants also failed to timely remove those investments from the Plans at the earliest opportunity given that the Funds were inappropriate for the Plans and were not meeting the objectives for which the Funds were selected.

205.    Defendants also failed to monitor the Structured Alpha Funds in a manner that was appropriate given the circumstances of the investments and the Plans. Had Defendants engaged in proper forms of monitoring at appropriate intervals, they would have removed both Funds when it was apparent that the Funds were not providing diversification from equity markets nor

FIRST AMENDED COMPLAINT –
CLASS ACTION (2:22-cv-01079-JCC) – 56

protecting the Plans against equity market downturns—the reasons the Funds were selected. Further, had Defendants appropriately monitored the Funds, it would have been apparent that the Funds' risk profile by 2018 was significantly different than had been assumed by the Board and Callan when the Plans invested in the Funds in 2014 and 2016. Awareness of these changes would have revealed that the Funds were not appropriate.

206.    The Board appointed the other fiduciaries of the Plans, including Callan, and had the responsibility to monitor Callan, promptly take corrective action in the event that Callan failed to prudently and appropriately discharge its duties, and remove Callan if necessary.

207.    The Board breached its fiduciary monitoring duties by, among other things:
a.  Failing to appropriately monitor and evaluate Callan's performance or have a system in place for doing so; and

b.  Failing to take any corrective action to address the fiduciary breaches described herein.

208.    Each of the above actions and omissions described in this Complaint demonstrates that Defendants failed to discharge their duties with respect to the Plans with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would have used in the conduct of an enterprise of like character and with like aims, thereby breaching their duties under 29 U.S.C. § 1104(a)(1)(B).

209.    Each Defendant is personally liable, and jointly and severally liable, under 29 U.S.C. §§ 1109(a), 1132(a)(2), and 1132(a)(3), to make good to the Plans the losses resulting from the aforementioned breaches. In addition, Defendants are subject to other equitable relief as provided by ERISA.

210.    Further, each Defendant is jointly and severally liable under 29 U.S.C. § 1105(a)(1)–(3) for the breaches of the other Defendants as well as any fiduciary breaches committed by Allianz, which was itself an ERISA fiduciary as the investment manager of the Structured Alpha Funds.

**ENGSTROM LEE**
1330 LAGOON AVE., 4TH FLOOR
MINNEAPOLIS, MN 55416
TEL: 612-699-4703

## COUNT II

### Common Law Breach of Fiduciary Duty
### As to Defendant Callan

211.    This cause of action is pleaded in the alternative to Count I as to Defendant Callan, should the Court determine that Callan was not acting in a fiduciary capacity pursuant to ERISA as to its recommendation and/or monitoring of the Structured Alpha Funds.

212.    The ERISA "statutory definition of a fiduciary departs from the common law." *Varity Corp. v. Howe*, 516 U.S. 489, 497 (1996). Because of this inconsistency, there are instances in which an "attempt to hold [d]efendant liable . . . pursuant to ERISA might fail due to ERISA's less-favorable definition of fiduciary, while the same attempt to hold [d]efendant liable under the same theory based on state common law could prevail due to the common law's comparably more favorable definition." *Wilbers v. Moneta Grp. Inv. Advisors, Inc.*, No. 406CV00005 ERW, 2006 WL 1360866, at *5 (E.D. Mo. May 17, 2006).

213.    Callan was the advisor to the Board and the Plans and had superior knowledge about investing. The Board depended upon Callan for monitoring, quantitative analysis, and advice related to selecting, monitoring, and removing the Plans' investments. Callan represented that it was providing investment recommendations that were customized to the financial situation, risk tolerance, and needs of the Plans. Callan's superior knowledge and capabilities were acute as to the Structured Alpha Funds, for which the Board lacked the sophistication or analytical capabilities.

214.    In its agreement with the Plans, Callan acknowledged that it was a fiduciary and stated that it would perform its duties "consistent with the standard of care imposed on consultants providing like investment performance services under . . . applicable law."[103]

215.    Further, Callan stated in its Form ADV that as to its advisory clients, it was making its recommendations in the best interests of its clients and without any conflicts of interest, further indicating a fiduciary relationship.

---

[103] ECF No. 32-3 at 5.

FIRST AMENDED COMPLAINT –
CLASS ACTION (2:22-cv-01079-JCC) – 58

**ENGSTROM LEE**
1330 LAGOON AVE., 4TH FLOOR
MINNEAPOLIS, MN 55416
TEL: 612-699-4703

216. Callan had an obligation to carry out its fiduciary duties with respect to the Plans with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and with experience and knowledge comparable to that of Callan would have acted.

217. Callan breached these fiduciary obligations by recommending investments that were plainly inappropriate for the Plans and by failing to recommend removing the Funds after receiving additional information that underscored their inappropriateness. Callan's failure to act with the level of prudence, care, and skill exercised by similarly situated fiduciaries is demonstrated, among many other reasons outlined throughout the Complaint, by the fact that no other defined benefit plan with variable benefit levels invested in the Funds, and only one other defined contribution plan in the country (out of hundreds of thousands such plans) invested in the Funds.

218. As a result of Callan's breach of fiduciary duties, the Board invested the Plans' assets in the Funds and retained them through April 2020. Had Callan not recommended the Funds, the Board would not have invested in them. Similarly, had Callan recommended that the Plans remove the Funds from the Plans, the Board would have likely followed that recommendation and removed the funds.

219. As a direct and proximate result of Callan's acts and omissions that were in breach of their fiduciary breaches, Plaintiffs and the other participants in the Plans have suffered significant financial losses described in detail above.

## COUNT III

### Common Law Negligence
### As to Defendant Callan

220. This count is pleaded in the alternative to Counts I and II, should the Court find that Callan is not a fiduciary under ERISA or the common law.

221. As the investment consultant to the Plans, Callan owed a professional duty to the Plans (Callan's clients) to exercise due care in the execution of its duties. Callan also owed a

FIRST AMENDED COMPLAINT –
CLASS ACTION (2:22-cv-01079-JCC) – 59

ENGSTROM LEE
1330 LAGOON AVE., 4TH FLOOR
MINNEAPOLIS, MN 55416
TEL: 612-699-4703

duty to the Plans and Plaintiffs (as participants in those Plans and thus the intended beneficiaries of Callan's consultant services). *See Certification from the United States Ct. of Appeals for the Ninth Cir. in Centurion Properties III, LLC v. Chicago Title Ins. Co.*, 186 Wash. 2d 58, 66 (2016) (non-client third party may sue for professional negligence where third party is the intended beneficiary of the contract). Indeed, Callan's investment consulting contract was with the Plans themselves.[104]

222. These duties include exercising appropriate due diligence and care before recommending an investment, both to investigate the merits of the investment and to perform an appropriate inquiry to ensure the investment is appropriate for the client in light of the client's investment objectives, time horizon, and risk tolerance.

223. Callan was compensated approximately $400,000 per year to act as the investment consultant for the Plans. In this capacity, Callan also had a duty to monitor the investments in the Plans to ensure that they remained appropriate investments that were consistent with the Plans' investment objectives.

224. Callan breached its duty of care by recommending investment in the Structured Alpha Funds in 2014 and 2016 even though the Funds were not appropriate in light of the Plans' structure, time horizon, financial objectives, and risk tolerance.

225. Callan further breached its duty of care by not recommending removal of the Funds from the Plans at the earliest opportunity in light of the Funds' inappropriateness for the Plans.

226. Callan also breached its duty of care by failing to monitor the Funds in a manner that was appropriate under the circumstances. Given the Funds' asymmetric return distributions and use of equity market and volatility options as the primary drivers of performance, this monitoring should have at a minimum included Value at Risk analysis, scenario analysis and stress testing, and sensitivity analysis.

227. Had Callan adequately monitored the Funds and communicated its findings to the

---

[104] ECF No. 32-3, at 6.

FIRST AMENDED COMPLAINT –
CLASS ACTION (2:22-cv-01079-JCC) – 60

**ENGSTROM LEE**
1330 LAGOON AVE., 4TH FLOOR
MINNEAPOLIS, MN 55416
TEL: 612-699-4703

Board as its duty of care required, Callan and the Board would have been aware of the lack of protections against severe volatility spikes as well as the lack of a diversification benefit from the Funds versus the equity portfolio held by the Plans, and would have removed the Funds from the Plans.

228.    As a direct and proximate result of Callan's breaches of the duty of care, Plaintiffs suffered significant losses in February and March 2020 when the Plans suffered $250 million in losses as a result of the catastrophic performance of the Funds.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs Johnson, Yahraus, and Purkiss, individually, as the Class Representatives, and on behalf of the Plans, pray for relief as follows:

A.    A determination that this action may proceed as a class action under Rule 23(b)(1), or in the alternative, Rule 23(b)(3) of the Federal Rules of Civil Procedure;

B.    Designation of Plaintiffs as Class Representatives and designation of Plaintiffs' counsel as Class Counsel;

C.    A declaration that Defendants have breached their fiduciary duties under ERISA;

D.    A declaration that Defendant Callan has breached its common law duty of care;

E.    Recalculation of the Pension Plan's rate of return for 2020 to account for the monetary relief provided by the judgment in this case, and concomitant adjustment to participants' benefits;

F.    An order compelling Defendants to personally make good to the Plans all losses incurred as a result of the breaches of fiduciary duties and/or breaches of the duty of care described herein, sufficient to make the Plans whole, and to restore the Plans to the position they would have been in but for this unlawful conduct;

G.    An order enjoining Defendants from any further violations of their ERISA fiduciary responsibilities, obligations, and duties;

H.    An order granting equitable restitution and other appropriate equitable monetary relief against Defendants;

I.    Other equitable relief to redress Defendants' illegal practices and to enforce the provisions of ERISA as may be appropriate, including appointment of an independent fiduciary or fiduciaries with final decision-making authority to run the Plans for a period of four years and removal of the fiduciaries deemed to have breached their fiduciary duties;

FIRST AMENDED COMPLAINT –
CLASS ACTION (2:22-cv-01079-JCC) – 61

ENGSTROM LEE
1330 LAGOON AVE., 4TH FLOOR
MINNEAPOLIS, MN 55416
TEL: 612-699-4703

J.    An award of pre-judgment interest;

K.    An award of attorneys' fees and costs pursuant to 29 U.S.C. § 1132(g) and/or the common fund doctrine; and

L.    An award of such other and further relief as the Court deems equitable and just.


Dated: October 28, 2022                          /s/Mark Thomson
                                                 **ENGSTROM LEE MCDONOUGH THOMPSON & THOMSON LLC**
                                                 Mark E. Thomson, MN Bar No. 0398260*
                                                 Carl F. Engstrom, MN Bar No. 0396298*
                                                 1330 Lagoon Ave, Fl 4
                                                 Minneapolis, MN 55408
                                                 Telephone: 612-699-4703
                                                 mthomson@engstromlee.com
                                                 cengstrom@engstromlee.com
                                                 *Appearing pro hac vice

                                                 Paul B. Derby, CA Bar No. 211352*
                                                 Hajir Ardebili, CA Bar No. 224624*
                                                 **SKIERMONT DERBY LLP**
                                                 633 West Fifth Avenue, Suite 5800
                                                 Los Angeles, CA 90071
                                                 Telephone: 213-788-4500
                                                 pderby@skiermontderby.com
                                                 hardebili@skiermontderby.com
                                                 *Appearing pro hac vice

                                                 Marie E. Casciari, WSBA No. 58223
                                                 **DEBOFSKY LAW, LTD.**
                                                 111 Queen Anne Ave North, Suite 201
                                                 Seattle, WA 98109
                                                 Telephone: (206) 333-2696
                                                 mcasciari@debofsky.com

                                                 *Counsel for Plaintiffs*

FIRST AMENDED COMPLAINT –
CLASS ACTION (2:22-cv-01079-JCC) – 62

**ENGSTROM LEE**
1330 LAGOON AVE., 4TH FLOOR
MINNEAPOLIS, MN 55416
TEL: 612-699-4703